EDGEWOOD INDEPENDENT SCHOOL DISTRICT, et al.

v.

William N. KIRBY, et al.

No. D-0378.

Supreme Court of Texas.

Jan. 22, 1991.

Rehearing Overruled Feb. 27, 1991.

491

David R. Richards, Austin, Richard E. Gray, III, Albert H. Kauffman, San Antonio, Roger Rice, Somerville, Mass., Norma V. Cantu, Albert H. Kauffman, Antonia Hernandez, Guadalupe T. Luna, San Antonio, David Hall, Weslaco, for petitioners.

Earl Luna, Robert E. Luna, Dallas, Jerry Hoodenpyle, Lynn Rossi Scott, Roger L. Hurlbut, Arlington, Kevin T. O'Hanlon, Mary F. Keller, Austin, for respondents.

## OPINION

PHILLIPS, Chief Justice.

We have previously held in this case that the state public school finance system vio-

lates article VII, section 1 of the Texas Constitution. 777 S.W.2d 391 (*"Edgewood I"*). Now we decide whether this violation remains following enactment of Senate Bill 1 by the 71st Legislature.[1] We hold that it does.

## I

This action commenced in May 1984 when numerous school districts and individuals sought a judicial declaration that the state public school finance system was unconstitutional. After trial on the merits in 1987, the district court found that the system violated the Texas Constitution in several respects and enjoined the State from funding it after September 1, 1989, unless the Legislature repaired the constitutional defects by that date. The court of appeals reversed the district court's judgment in December 1988. 761 S.W.2d 859. On October 2, 1989, this Court in *Edgewood I* reversed the judgment of the court of appeals and reinstated the injunction issued by the district court, but postponed its effect until May 1, 1990. On that date, state funding of public schools was to cease unless the Legislature conformed the system to the requirements of the Constitution. 777 S.W.2d 391.

The district court extended the May 1 deadline[2] to allow the Legislature to complete its work on what became Senate Bill 1, which the Governor signed into law June 7, 1990.[3] Once Senate Bill 1 became law, plaintiffs returned to the district court seeking both a declaration that the system

remained unconstitutional and an order enforcing the injunction affirmed by this Court in *Edgewood I.* After a lengthy hearing, the district court found that despite the changes in Senate Bill 1, the school finance system remained unconstitutional. Nevertheless, the district court vacated our injunction and denied any other injunctive relief or enforcement of this Court's mandate. The district court stated in its judgment that it would not entertain requests for further relief until it became apparent that the Legislature would not adopt a constitutional school funding system to be implemented beginning September 1, 1991.

■ Plaintiffs now seek relief from this judgment, arguing in substance that the district court exceeded its authority by vacating this Court's injunction and postponing consideration of further injunctive relief. Defendant state officials also complain by cross-appeal that the district court erred in finding that the school finance system continues to violate the Constitution after enactment of Senate Bill 1. Defendant-intervenor school districts challenge the Court's jurisdiction to consider any of these contentions.[4]

## II

At the outset we must determine whether our jurisdiction has been properly invoked. Plaintiffs, plaintiff-intervenors and defendant state officials all assert that they are entitled to appeal the district

---

1. Act of June 7, 1990, 71st Leg., 6th C.S., ch. 1, 1990 Tex.Gen. Laws 1.

2. The parties did not complain to this Court of the district court's extension of our May 1, 1990 deadline, and we should not be viewed as approving this action.

3. We noted when we issued our opinion in *Edgewood I* that the Governor had called the Legislature into special session beginning November 14, 1989. 777 S.W.2d at 399 n. 8. The school funding system was not included in the call, however, until the third special session of the Legislature, which began February 27, 1990. That session adjourned without adopting corrective legislation, as did the fourth special session, which immediately followed and adjourned on May 1, 1990. At the fifth special session, which

began May 2, 1990, a school finance bill was passed by both houses of the Legislature but was vetoed by the Governor on May 22, 1990. Tex.S.B. 1, S.J. OF TEX., 71st Leg., 5th C.S. 145 (1990). Senate Bill 1 was enacted during the sixth special session.

4. Plaintiffs also complain that the district court erred in refusing to award them the entire amount of attorney fees requested. This complaint has nothing to do with the enforcement of our mandate. Moreover, on the record before us, the issue is not one over which we will exercise direct appeal jurisdiction. *See* TEX.R. APP.P. 140(b). Plaintiffs' appeal on this issue is therefore dismissed, without prejudice to seeking review in the court of appeals in accordance with appellate rules. *See* TEX.R.APP.P. 140(e).

court's judgment directly to this Court, based upon article V, section 3–b of the Constitution[5] and section 22.001(c) of the Government Code.[6] Defendant-intervenors counter that the district court's judgment is not one from which a direct appeal is authorized by these constitutional and statutory provisions. We need not pass on these contentions because we conclude that the parties are properly before us for other reasons.

By our judgment in *Edgewood I,* the injunction originally issued by the district court and affirmed as modified by this Court became an order of both this Court and the district court. *See State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984); *City of Tyler v. St. Louis Southwestern Ry.,* 405 S.W.2d 330, 332 (Tex.1966). As the district court recognized, it was obliged to observe and enforce our judgment as rendered in the absence of changed conditions. *Id.* It is not for us to ascertain in the first instance whether conditions have changed since *Edgewood I;* that determination must be made by the district court, which can hear evidence, subpoena witnesses and make findings. *Id.* The district court's decision is reviewable on appeal. *Id.* However, we also have the power to enforce our mandate by mandamus if we can determine, without resolving factual disputes, that conditions have not changed and that the district court abused its discretion. *See Walker,* 679 S.W.2d at 485; *see also Texas Aeronautics Comm'n v. Betts,* 469 S.W.2d 394, 399 (Tex.1971); *Conley v. Anderson,* 164 S.W. 985, 986 (Tex.1913); *Wells v. Littlefield,* 62 Tex. 29, 30–31 (1884). As we said in *City of Tyler:* "in the absence of changed conditions it is the duty of the trial court to enforce the judgment [of this Court] as entered; and, if

necessary, this Court can compel its enforcement." 405 S.W.2d at 332.

The district court concluded as a matter of law that Senate Bill 1 does not change the school finance system condemned in *Edgewood I,* and thus that the Legislature had not met its constitutional obligations. In this regard, the district court found no change in conditions since *Edgewood I.* The district court vacated our injunction, however, on the equitable grounds of deference to the Legislature and avoidance of disruption to public education. These equitable considerations are not changed conditions. They have been present throughout this litigation, and this Court was fully mindful of them in *Edgewood I.* Only this Court, not the courts below, may decide that for policy reasons our mandate should be modified or vacated. *Conley,* 164 S.W. at 986.

Plaintiffs request this Court to enforce its mandate. We have not only the power but the duty to enforce our mandate upon the request of a party if we determine that the district court acted improperly. *See Wells,* 62 Tex. at 30–31. We therefore treat this proceeding as being in the nature of an original mandamus proceeding to direct the district court to reinstate our injunction. If as a matter of law the district court was correct in its determination that the constitutional violation in the school finance system which we found in *Edgewood I* continues, then it clearly abused its discretion in vacating our injunction. Accordingly, we consider whether the school finance system remains unconstitutional following Senate Bill 1.

### III

Senate Bill 1 does make certain improvements in public school finance. It attempts to realize the long-articulated ob-

---

**5.** "The Legislature shall have the power to provide by law, for an appeal direct to the Supreme Court of this State from an order of any trial court granting or denying an interlocutory or permanent injunction on the grounds of the constitutionality or unconstitutionality of any statute of this State, or on the validity or invalidity of any administrative order issued by any state agency under any statute of this State."

**6.** "An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state. It is the duty of the supreme court to prescribe the necessary rules of procedure to be followed in perfecting the appeal."

jective of assuring school districts substantially similar educational revenue for similar levels of local tax effort[7] by providing for a wide array of biennial studies to detect deviations from fiscal neutrality and inform senior policy makers when increased state funding is required.[8] These policy makers then recommend to the Legislature the amount of funds that should be allocated for public education for the succeeding biennium. Thus, for the first time, the system contains a mandate for biennial adjustment, based upon information from a battery of studies, with the intention of preventing the opportunity gap between poor and rich districts from re-widening each time legislative action narrows it.

However, Senate Bill 1 leaves essentially intact the same funding system with the same deficiencies we reviewed in *Edgewood I.* Senate Bill 1 maintains the basic two-tiered education finance structure known as the Foundation School Program. The first tier is a basic allotment designed to enable all districts to provide a basic education to all pupils. Each district that taxes itself at or above a minimum level is guaranteed a certain base level of funding, composed of state and local revenue, per weighted student in average daily attendance.[9] The second tier is the guaranteed yield or equalized enrichment tier, which is designed to equalize the ability of school districts to raise revenue to supplement their basic allotment. At this tier, all districts receive a guaranteed revenue per weighted student for each cent of local tax effort above the tier one minimum level. The State funds the difference between the guaranteed revenue and the amount each cent of local tax effort generates. If a district is so wealthy that each cent of tax effort generates more than the guaranteed revenue per weighted student, it receives no tier two revenue from the State.[10] To maximize their entitlement to state funding under tiers one and two, Senate Bill 1 contains incentives for most school districts to set their effective local tax rates at or above a state-designated minimum level.[11]

The State asserts that as districts respond to these incentives and as it shifts more of its funds to lower wealth districts, Senate Bill 1 will achieve substantial equity among the districts that educate 95% of our students. The State maintains that excluding the districts with the wealthiest 5% of the students is reasonable and within the *Edgewood I* requirement of "substantially equal access to similar revenues per pupil at similar levels of tax effort." 777 S.W.2d at 397. It argues that the annual cost of equalizing all districts to the revenue levels attainable by the richest districts would be approximately four times the annual cost

---

**7.** Senate Bill 1 amends section 16.001(c)(1) of the Education Code to read: "the yield of state and local educational program revenue per pupil per cent of effective tax effort shall not be statistically significantly related to local taxable wealth per student for at least those districts in which 95 percent of students attend school." The concept of similar yield for similar rates of taxation has been termed "fiscal neutrality."

**8.** The senior policy makers are those who serve on the Legislative Education Board (LEB), the Legislative Budget Board (LBB), and Foundation School Fund Budget Committee (FSFBC). The LEB and the LBB are charged by Senate Bill 1 with the duty of carrying out the various studies. The LEB reports to the FSFBC regarding the funding levels indicated by the studies. The FSFBC, comprised of the Governor, Lieutenant Governor and Comptroller, ultimately makes funding recommendations to the legislature.

**9.** Because certain pupils, such as those needing bilingual instruction or participating in special education programs, are more expensive to educate than others, most educational revenue is distributed according to complex formulas that assign "weights" to students with different needs.

**10.** However, under the current system, all districts receive about $300 per student from the Available School Fund established by article VII, section 5(a) of the Constitution. The Constitution does not require this distribution, stating only that "the available fund herein provided shall be distributed to the several counties according to their scholastic population and applied in such manner as may be provided by law." The manner of distribution is provided by statute. TEX.EDUC.CODE § 15.10.

**11.** The district court also described a third tier, consisting of further local supplementation of the public school finance system. The question of local enrichment continues to be controlled by this Court's opinion in *Edgewood I,* 777 S.W.2d at 397–98.

of operating the entire state government. Even if the incentives in the new law do not produce the anticipated results, the State contends that the newly mandated studies will lead to increased state funding, which will in turn produce equity. Plaintiffs complain of both the manner in which the State has attempted to achieve fiscal neutrality and the State's decision to exclude the wealthiest districts from the equalization formula.

We need not address the conflicting prognostications of the parties about whether Senate Bill 1 can or will be implemented to achieve efficiency among 95% of students. Although the parties presented much evidence about what may or may not happen in the future, the issue before us is whether present conditions have changed in such a way that the injunction ordered by this Court should not be enforced. The only material changes in the system since *Edgewood I* are those made by Senate Bill 1. The question we address is whether there is any evidence that those changes remove the constitutional violation.

In analyzing the constitutionality of the system after Senate Bill 1, we begin with the following conclusion in *Edgewood I,* grounded on the Texas Constitution:

> The legislature's recent efforts have focused primarily on increasing the state's contributions. More money allocated under the present system would reduce some of the existing disparities between districts but would at best only postpone the reform that is necessary to make the system efficient. A Band–Aid will not suffice; the system itself must be changed.

777 S.W.2d at 397. Even if the approach of Senate Bill 1 produces a more equitable utilization of state educational dollars, it does not remedy the major causes of the wide opportunity gaps between rich and poor districts. It does not change the boundaries of any of the current 1052 school districts, the wealthiest of which continues to draw funds from a tax base roughly 450 times greater per weighted pupil than the poorest district. It does not change the basic funding allocation, with approximately half of all education funds coming from local property taxes rather than state revenue. And it makes no attempt to equalize access to funds among all districts. By limiting the funding formula to districts in which 95% of the students attend school, the Legislature excluded 132 districts which educate approximately 170,-000 students and harbor about 15% of the property wealth in the state. A third of our students attend school in the poorest districts which also have about 15% of the property wealth in the state. Consequently, after Senate Bill 1, the 170,000 students in the wealthiest districts are still supported by local revenues drawn from the same tax base as the 1,000,000 students in the poorest districts.

These factors compel the conclusion as a matter of law that the State has made an unconstitutionally inefficient use of its resources. The fundamental flaw of Senate Bill 1 lies not in any particular provisions but in its overall failure to restructure the system. Most property owners must bear a heavier tax burden to provide a less expensive education for students in their districts, while property owners in a few districts bear a much lighter burden to provide more funds for their students.[12] Thus, Senate Bill 1 fails to provide "a direct and close correlation between a district's tax effort and the educational resources available to it." 777 S.W.2d at 397.

To be efficient, a funding system that is so dependent on local ad valorem property taxes must draw revenue from all property at a substantially similar rate. The present system does not do so. For example, if the Glen Rose ISD in Somerville County main-

---

12. As explained in the Governor's message vetoing the predecessor to Senate Bill 1, which had a substantially similar funding approach:

> It is the finance system itself which is at the heart of the Texas Supreme Court holding that our education system violates the Constitution. The current system is not fair, and it

> is not equitable. Yet, S.B. 1 would basically continue the current system of subsidizing wealthier school districts at the expense of property poor school districts.... This bill places an unfair burden on local property taxpayers to support an inequitable system.

S.J. OF TEX., 71st Leg., 5th C.S. 145 (1990).

tained its 1989–90 tax rate of 25.3 cents per one hundred dollars of valuation, it would generate over $9500 this year for each of its 1170 students. If the property within Glen Rose were taxed at the same 91 cent rate that districts must impose this year under Senate Bill 1 to maximize the funding they receive from the State, that property would generate an additional $28 million. Similarly, if the property within Highland Park ISD in Dallas County were taxed at that level, it would generate an additional $18 million this year. The property within Iraan–Sheffield ISD in Pecos County would generate an extra $14 million. These examples illustrate the degree to which the current system insulates concentrated areas of property wealth from being taxed to support the public schools. The result is that substantial revenue is lost to the system. If the property in these and similar districts were taxed at substantially the same rate as the rest of the property in the state, the system could have hundreds of millions of additional dollars at its disposal. Whether this additional revenue were used to increase the attainable equalized funding level, ease the State's burden, or lower the tax rate each district must impose, the system would be made more efficient simply by utilizing the resources in the wealthy districts to the same extent that the remainder of the state's resources are utilized.

There are vast inefficiencies in the structure of the current system. With 1052 school districts, some having as few as two students, and with up to twenty districts within a single county, duplicative administrative costs are unavoidable.[13] Consolidation of school districts is one available ave-

nue toward greater efficiency in our school finance system.

Another approach to efficiency is tax base consolidation. Senate Bill 1 expressly provides that future legislatures may use other methods to achieve fiscal neutrality, including "redefining the tax base." TEX. EDUC.CODE § 16.001(d). We disagree with the district court's observation that this option "appears to run afoul of certain constitutional provisions related to taxation." The district court was apparently concerned that consolidation of tax bases violated this Court's opinion in *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20 (1931). In that case, we held that the City of Dallas could not be compelled to educate high school students who resided outside of the school district, which the city then operated. The decision rested in part upon our interpretation of article VII, section 3 of the Constitution, which we said "contemplates that districts shall be organized and taxes levied for the education of scholastics *within the districts.*" *Id.* at 367, 40 S.W.2d at 27 (emphasis added). We also said that "the necessary implication from the constitutional provision is that the Legislature cannot compel one district to construct buildings and *levy taxes for the education of nonresident pupils.*" *Id.* (emphasis added).

Article VII of the Constitution accords the Legislature broad discretion to create school districts and define their taxing authority.[14] The Constitution does not present a barrier to the general concept of tax base consolidation, and nothing in *Love* prevents creation of school districts along county or other lines for the purpose of collecting tax revenue and distributing it to other school districts within their bound-

---

**13.** Allamoore CSD and Juno CSD have two students each, and Harris County contains twenty independent school districts. Moreover, Bexar, Dallas, Hidalgo, McLennan and Tarrant Counties each contain fifteen or more school districts.

**14.** Since this constitutional grant of power does not specify the details of statutory implementation, a number of alternatives are available to the Legislature. One such method, already in place, allows voters to "create an additional

countywide school district which may exercise in and for the entire territory of the county the taxing power conferred on school districts by Article VII, Section 3, of the Texas Constitution." TEX.EDUC.CODE § 18.01. The voters are permitted to implement such a taxing scheme "without affecting the operation of any existing school district within the county." *Id.* Chapter 18 of the Education Code is also consistent with counties' constitutional role in distributing educational resources. *See* TEX. CONST. art. VII, § 5.

aries.[15] While consolidating tax bases may not alone assure substantially equal access to similar revenues, the district court erred in concluding that it is constitutionally prohibited.

We do not undertake lightly to strike down an act of the Legislature. We are mindful of the very serious practical and historical difficulties which attend the Legislature in devising an efficient system, and we recognize the efforts of the legislative and executive departments to achieve this goal. We do not prescribe the means which the Legislature must employ in fulfilling its duty. Nor do we suggest that an efficient funding system will, by itself, solve all of the many challenges facing public education in Texas today. Nevertheless, our duty is plain: we must measure the public school finance system by the standard of efficiency ordained by the people in our Constitution. The test for whether a system meets that standard is set forth in our opinion in *Edgewood I.* 777 S.W.2d at 397–98. Under that standard, we therefore hold as a matter of law that the public school finance system continues to violate article VII, section 1 of the Constitution.

While we share the district court's desire to avoid disruption of the educational pro-

cess, we must heed our duty to ensure Texas students the efficient education system guaranteed them by the Constitution. *See Morton v. Gordon,* Dallam 396, 397–98 (Tex.1841). If the educational process is to be disrupted, it will be because the demands of the Constitution cannot be further postponed.

## IV

The district court correctly concluded that conditions have not changed since *Edgewood I* because the public school finance system has not been altered to comply with article VII, section 1 of the Texas Constitution. The district court clearly abused its discretion in refusing to enforce the mandate of this Court issued in *Edgewood I.*

We therefore direct the district court to vacate that portion of its judgment which vacates the injunction affirmed by this Court in *Edgewood I.*[16] Because the deadlines set by that injunction have passed, we must modify those deadlines. However, the need for an efficient system remains as compelling today as it was when we last visited this issue, at which time we stated: "A remedy is long overdue. The legislature must take immediate action." 777

---

**15.** Article VII, section 3 of the Constitution expressly authorizes the Legislature to provide for school districts "composed of territory wholly within a county or in parts of two or more counties." Many school districts, such as Nueces Canyon ISD, Uvalde Consolidated ISD and Sands ISD, currently encompass parts of several counties.

**16.** The injunction originally issued by the district court was as follows:

INJUNCTION

It is hereby ORDERED that William N. Kirby, Commissioner of Education, the Texas State Board of Education, and Robert Bullock, Comptroller of the State of Texas and their successors, and each of them, be and are hereby enjoined from giving any force and effect to the sections of the Texas Education Code relating to the financing of education, including the Foundation School Program Act (Chapter 16 of the Texas Education Code); specifically said Defendants are hereby enjoined from distributing any money under the current Texas School Financing System (Texas Education Code § 16.01, *et seq.,* implemented in conjunction with local school district boundaries that contain unequal taxable

property wealth for the financing of public education).

It is further ORDERED, that this injunction shall in no way be construed as enjoining Defendants, their agents, successors, employees, attorneys, and persons acting in concert with them or under their direction, from enforcing or otherwise implementing any other provisions of the Texas Education Code.

In order to allow Defendants to pursue their appeal, and should this decree be upheld on appeal, to allow sufficient time to enact a constitutionally sufficient plan for funding public education, this injunction is stayed until September 1, 1989. It is further ORDERED that in the event the legislature enacts a constitutionally sufficient plan by September 1, 1989, this injunction is further stayed until September 1, 1990, in recognition that any modified funding system may require a period of time for implementation. This requirement that the modified system be in place by September 1, 1990, is not intended to require that said modified system be fully implemented by September 1, 1990.

S.W.2d at 399. Balancing the need for immediate action against the realities of the legislative process, and desiring to avoid or minimize disruption of the educational process, we stay the effect of the injunction until April 1, 1991.[17] The district court is directed not to extend this deadline or to modify this injunction.

We trust the district court will promptly comply, and we will withhold issuance of our writ unless it fails to do so.

### OPINION ON MOTION FOR REHEARING

On motion for rehearing, plaintiff-intervenors request that we modify our opinion to overrule *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20 (1931), or interpret that case "in a manner that would permit the [state-wide] recapture of local ad valorem revenues for purposes of equalization." We believe *Love* is sound and decline to overrule or modify it. Moreover, the interpretation requested by plaintiff-intervenors would violate the Texas Constitution. Accordingly, we overrule the motion for rehearing.

In *Love,* this Court held that the City of Dallas could not be compelled to educate students who resided outside of the city's school district. We held that article VII, section 3 of our Constitution only "contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts." 120 Tex. at 367, 40 S.W.2d at 27. Focusing on the Legislature's power to create school districts and define their taxing authority, we noted in this opinion that, consistent with *Love* and contrary to the district court's suggestion, tax base consolidation could be achieved

through the creation of new school districts. We said these school districts could be organized along county or other lines and could be given the authority to generate local property tax revenue for all of the other school districts within their boundaries.

Plaintiff-intervenors now urge us to go further. They argue that all school districts are mere creatures of the state, and "in reality, all taxes raised at the local level are indeed State taxes subject to state-wide recapture for purposes of equalization." Their position raises the question of whether the Legislature may constitutionally authorize school districts to generate and spend local taxes to enrich or supplement an efficient system.[1] Because the Constitution does permit such enrichment, without equalization, local taxes cannot be considered "State taxes subject to state-wide recapture."

Our Constitution clearly recognizes the distinction between state and local taxes, and the latter are not mere creatures of the former. The provision that "[n]o State ad valorem taxes shall be levied upon any property in this State," TEX. CONST. ART. VIII, § 1–e, prohibits the Legislature from merely recharacterizing a local property tax as a "state tax." Article VII, section 3, however, states that "the Legislature may authorize an *additional* ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the *further* maintenance of public free schools, and for the erection and equipment of school buildings *therein.*" TEX. CONST. ART. VII, § 3 (emphasis added). These constitutional provisions mandate that local tax revenue is not subject to state-wide recapture.

---

**17.** Specifically, we modify the injunction by extending the date September 1, 1989, to April 1, 1991, and the date September 1, 1990, to September 1, 1991.

**1.** In addition, defendants' response to plaintiff-intervenors' motion for rehearing submits that "there continues to be considerable discussion of the meaning of the language of *Edgewood I* referenced in footnote 11 of *Edgewood II.*" Defendants therefore "urge the Court to clarify whether local enrichment violates the Constitution as interpreted by *Edgewood I* and *Edge-*

*wood II* if the yield from local tax effort varies because of the value of a local community's tax base." Defendants have consistently urged the court to clarify whether unequalized local enrichment is permissible under the Constitution. Indeed, their original brief asserted by cross-point that the district court erred in "applying a standard of total equality" that mandated the elimination of all unequalized local enrichment. The motion for rehearing and defendants' response suggest the need for greater clarity in our resolution of defendants' argument.

This conclusion highlights the basic constitutional distinction between the State's primary obligation and the local districts' secondary contributions. The current system remains unconstitutional not because *any* unequalized local supplementation is employed, but because the State relies so heavily on unequalized local funding in attempting to discharge its duty to "make suitable provision for the support and maintenance of an efficient system of public free schools." TEX. CONST. ART. VII, § 1.[2] Once the Legislature provides an efficient system in compliance with article VII, section 1, it may, so long as efficiency is maintained, authorize local school districts to supplement their educational resources if local property owners approve an additional local property tax.[3]

Because the relief sought by plaintiff-intervenors would violate the Constitution, their motion for rehearing is overruled.[4] This Court will entertain no further motions for rehearing in this cause. Tex.R. App.P. 190(d).

Concurring opinions on motion for rehearing by GONZALEZ, and GAMMAGE, JJ.

Concurring opinion on motion for rehearing by DOGGETT, J., joined by MAUZY and GAMMAGE, JJ.

GONZALEZ, Justice, concurring.

In *Edgewood I*, we held that the state's school financing system was neither financially efficient nor efficient in the sense of providing for a "general diffusion of knowledge" statewide, and therefore it violated article VII, section 1 of the Texas Constitution. 777 S.W.2d at 395, 397 (Tex. 1989). We further declared that we would not instruct the legislature as to the specifics of the legislation it should enact; nor did we order it to raise taxes. We stated that the legislature has the primary responsibility to decide how best to achieve an efficient system.

The issue before us in *Edgewood II* was whether this violation remained following the enactment of Senate Bill 1 by the 71st Legislature. 804 S.W.2d 493 (1991). We held that the fundamental flaw of Senate Bill 1 "lies not in any particular provisions but in its overall failure to restructure the system." *Id.* at 496. We concluded that since the public school finance system had not been altered to comply with article VII, section 1 of the Texas Constitution, the district court abused its discretion in refusing to enforce the mandate issued in *Edgewood I*.

We should not speculate or interfere with the ongoing legislative debate as to how to meet the mandates of *Edgewood I* or *Edgewood II*; nor should we get into the business of giving the legislature pre-clearance on proposed legislation. *See Muskrat v. United States*, 219 U.S. 346, 362, 31 S.Ct. 250, 255, 55 L.Ed. 246 (1911). To say now what might be constitutional would get into the area of advisory opinions. We have repeatedly held that under our constitution, judicial power does not embrace the

---

**2.** As explained in *Edgewood I*, the mandate of efficiency in article VII, section 1, while not requiring "a per capita distribution" or absolute equality, does prohibit the "gross inequalities" and "vast disparities" resulting from "concentrations of resources in property-rich school districts that are taxing low when property-poor districts that are taxing high cannot generate sufficient revenues to meet even minimum standards." 777 S.W.2d at 395, 396, 397. We therefore required "a direct and close correlation between a district's tax effort and the educational resources available to it." *Id.* at 397.

**3.** In advocating the amendment of article VII, section 3 to permit local supplementation, Governor Ireland explained that local districts should be "allowed to levy and collect an additional tax for the purpose of *aiding* the State in

its efforts at giving the people an education." Message of Governor Ireland, *reprinted in* Texas S.J., 18th Legislature, Regular Session, 66, 67 (January 29, 1883) (emphasis added).

**4.** In their response to the motion for rehearing, defendant-intervenors express concern that if the Legislature fails to enact a constitutional school finance bill by April 1, 1991, our injunction will preclude the State from honoring its obligations as the guarantor of bonds issued by local school districts. These concerns are unfounded. We adopt the language of the trial court's original order in this regard, modifying the September 1, 1990, date in that portion of the order to September 1, 1991. Our deadline of April 1, 1991, for legislative action remains unchanged.

giving of advisory opinions. *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1969); *Correa v. First Court of Appeals,* 795 S.W.2d 704, 705 (Tex.1990).

As our court stated in *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 643 (1933):

> Ordinarily, we believe the rendition of advisory opinions is to be regarded as the exercise of **executive** rather than **judicial** power. This seems to have been the conception of those who framed the Constitution, since by that instrument the Attorney General, a member of the Executive Department, is the only state officer expressly authorized to render such opinions. State Constitution, article 4, §§ 1, 22. At any rate, the rendition of advisory opinions has generally been held not to be the exercise of **judicial power**. (citations omitted).

For all these reasons, I would overrule the motion for rehearing without an opinion.

GAMMAGE, Justice, concurring.

The motion for rehearing before this court properly raises only one issue—the viability of our earlier opinion in *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20 (1931). Since nothing in either *Edgewood I,* 777 S.W.2d 391, or *Edgewood II,* 804 S.W.2d 491, suggests that *Love* was overruled, the motion should be overruled without opinion.

Any opinion issued on the motion should narrowly confine itself to the question *presented.* The majority's gratuitous action in addressing matters not raised in the motion for rehearing is both unnecessary and inappropriate, amounts to an advisory opinion, and is calculated to further confound and confuse the public and the legislative process.

For these reasons, I concur in the overruling of the motion for rehearing but would have done so without an opinion, and further join Justice Doggett in his concurring opinion.

DOGGETT, Justice, concurring.

Twice this court has labored arduously to speak with one, clear voice concerning this most significant case. Twice this court has achieved consensus in opinions, signed by a single member, but incorporating the work of all. Tragically, today this unity has been abruptly abandoned, shattering the good faith upon which it was founded. Determined to react to extrajudicial developments, the court exceeds its jurisdiction, contravenes its rules, and ignores limitations imposed on it by tradition and the Constitution. It muddles the law and meddles in the legislative process. Advice not properly sought is offered anyway, despite the warning of the Chairman of the Senate Education Committee that further judicial interference will be disruptive and his indication that the Legislature already has all the judicial advice necessary "to remedy the constitutionally flawed system of public education...." Amicus Brief on Motion for Rehearing, Sen. Carl Parker, at 2; *see also* Supplemental Response of Plaintiff–Appellants to Motion for Rehearing at 2 (Further action by the court "would likely impede, rather than facilitate this [legislative] process."). Accordingly, the opinion on rehearing constitutes a frantic rush to influence the final stages of current legislative deliberations and will only prolong correction of our inefficient educational system at the expense of the school children of Texas.[1]

Today a judge expounds on social policy preferences rather than resolving a motion. The underlying need for writing arises from the fear that the Legislature may otherwise fail to satisfy certain judicial desires, not that it may inadvertently pursue some further unconstitutional course. The restraint observed by a unified court has become the activism promoted by a majority of a divided one. For the reasons set forth herein, I dissent from the opinion on the motion for rehearing in the strongest

---

**1.** Judicial tampering that prolongs an equitable solution is especially discouraging given the time that has elapsed since this cause was originally filed. A child then in the first grade is now in the eighth. With today's interference, another generation of children may conclude their public schooling before complete reform is achieved.

possible terms but concur with the decision that this motion should be overruled.

This self-styled "Opinion on Motion for Rehearing" is a misnomer. It is not a true opinion generated in response to a party's motion for rehearing; rather, it is an answer to a question that a movant never asked. The only motion before us consists of four narrowly crafted paragraphs concerning the validity of a single prior opinion:

> This Motion for Rehearing is filed for the *limited* purpose of requesting modification or clarification of this Court's opinion with respect to the continued force and effect of *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20 (1931).

Plaintiff–Intervenors' Motion for Rehearing at 1 (emphasis added). If the court believed that this request was either meritless or inappropriate, the direct response was simply to overrule the motion as recommended by three of the succinct replies. Instead, by overwriting and miswriting the court offers observations that are strangely at variance with one aspect of the recapture issue on which the Defendants, the Plaintiff–Appellants, and the Plaintiff–Intervenors all agree.[2]

The court's main objective is to misuse one party's pleading on a single issue to benefit an opponent on other unrelated concerns.[3] It wrongfully claims that the movant's

> position raises the question of whether the legislature may constitutionally authorize school districts to generate and

spend local taxes to enrich or supplement an efficient system.

804 S.W.2d at 499. The motion does not even remotely ask any such question. Rather, in a desperate effort to justify its misguided action, the court rephrases the motion to present a question that a judge wants to answer. The opinion converts the issue of whether locally-raised taxes may be used to fund other school districts elsewhere in the state to whether locally-raised taxes may be used locally to provide supplemental funds in the same district.

Today's opinion reacts not to a movant's properly filed pleading but solely to exigencies evidenced in pleadings of a different sort—media reports and commentaries, of the type set forth in Appendix A to this dissent. While constitutional interpretation involves some adjustment to changing societal conditions and must reflect "the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time," *Edgewood Ind. School Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex.1989) (*Edgewood I*); *Damon v. Cornett*, 781 S.W.2d 597, 599 (Tex.1989), we should not abruptly reinterpret the basic fabric of our jurisprudence because a judge is startled by what he reads in the newspaper. The true message sent forth today is "don't write a legal brief, write a political column." This is apparently the first time in its 151–year history that the court has operated in the manner it has today.

Indicative of the true nature of this opinion is the near total absence of supporting

---

**2.** Defendants' Response to Motion for Rehearing, at 2–3; Plaintiff–Appellants' Response to Motion for Rehearing; Plaintiff–Intervenors' Motion for Rehearing.

**3.** The applicable procedural rule speaks clearly concerning the presentment and consideration of such motions:

> A motion for rehearing may be filed with the clerk of the court within fifteen days after the date of rendition of the judgment.... The points relied upon for the rehearing shall be distinctly specified in the motion. The *party* filing such motion shall deliver or mail to each party, or his attorney of record, a true copy of such motion....

Tex.R.App.P. 190 (emphasis supplied). This rule limits our consideration to points brought forward by the parties. *See also, e.g.,* Tex.R. App.P. 131(e) (points of error brought to supreme court must be presented in motion for rehearing in court of appeals); *Lone Star Steel Co. v. Owens*, 302 S.W.2d 213, 223 (Tex.Civ.App. —Texarkana 1957, writ ref'd n.r.e.) (complaints not raised in a motion for rehearing are no longer before the courts of appeals for decision); State Bar of Texas, Appellate Procedure in Texas 552 (2d ed. 1979). The court today ignores requirements ordinarily imposed on the preservation and presentation of points of error. At issue here, however, is much more than a debate concerning the legal intricacies of appellate procedure.

legal authority excepting the single case raised by movants that provided the convenient excuse for further writing. Perhaps this is because the only true precedent for today's action is an earlier embarrassing chapter in Texas jurisprudence that the court does not cite. Without parties, attorneys, or a pending appeal—solely on its own initiative—this court once declared legislation unconstitutional. *See In re House Bill No. 537 of the Thirty–Eighth Legislature,* 113 Tex. 367, 256 S.W. 573 (1923).[4] While dressed in seemingly more respectable language, a similar judicial encroachment has occurred again today.

In denying the motion for rehearing and writing on this completely separate issue, the opinion deprives the movants of any opportunity to complain or request correction of this new discussion. Having received, to their surprise and undoubted chagrin, an answer to a question they did not ask, the movants can never again be heard because "[t]his court will entertain no further motions for rehearing in this cause." 804 S.W.2d at 500. *See* Tex.R.App.P. 190(d). By including analysis of a new issue in an opinion denying the motion for rehearing, the court chisels these words in stone, arrogating to itself an authority beyond review. This precedent for deciding questions not properly presented should alert appellate lawyers in all cases to file motions for rehearing at their peril. Asking for rehearing is risky business because the court in its enthusiasm may rule on subjects not presented while denying further review.

And, having accomplished this coup today, why is a motion for rehearing even necessary? Since the court may issue opinions unrelated to points raised by a movant, the motion itself is superfluous. Why should the court not encourage public debate of an opinion and thereafter fix whatever is necessary, resolving every dissatisfaction, and dispelling any confusion? This would further save litigants the expense of paying lawyers to file motions and provide legal advice.

The thickest camouflage for today's judicial handiwork is provided by the disingenuous suggestion that a Friday afternoon reply by Attorney General Dan Morales to the only motion for rehearing had something to do with this Monday opinion. The only request from that belated filing on which the court acts is the suggestion that we answer at least one of the four questions addressed to us in an amicus brief. Defendants' Response to Motion for Rehearing at 4–5. Eleven members of the Legislature asked us to engage in what they describe as the "extraordinary" step of prejudging their conduct.[5] Amicus Brief on Motion for Rehearing, Rep. Junell, at 5. Having already determined to respond to newspaper pleadings, today's opinion has no problem with simultaneously answering the query of these nonparties despite its impropriety.[6]

From the birth of our nation, courts have declined requests from officials in other branches of government to issue advisory opinions.[7] In Texas this matter was specif-

---

**4.** *See also* Calvert, *Declaratory Judgments in Texas—Mandatory or Discretionary?,* 14 St. Mary's L.J. 1, 3 n. 3 (1982); Note, *Courts—Constitutionality of Declaratory Judgments,* 3 Tex.L. Rev. 483, 485 (1925).

**5.** One of these members ironically achieves more here as an amicus than he could at the trial court where an order striking his intervention was issued. Transcript at 168–69.

**6.** *See Fri v. Sierra Club,* 414 U.S. 884, 94 S.Ct. 33, 38 L.Ed.2d 132 (1973) (finding that an amicus has no standing to independently seek a rehearing); *Texas v. Jefferson Iron Co.,* 60 Tex. 312, 315 (1883) ("Our court has recognized the right of an *amicus curiae* to speak, and has held that while such volunteer action of counsel is permissible," the court, "upon being so informed,

could do only that which it could do without such action of counsel, and no more."); *see also Moseby v. Burrow,* 52 Tex. 396, 403 (1880).

An amicus curiae is limited to making suggestions to the court, *Jones v. City of Jefferson,* 66 Tex. 576, 1 S.W. 903, 904 (1886), not posing new questions. *See generally,* J. Denton, Appellate Procedure in Texas 355 (O. Walker ed. 2d ed. 1979); Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy,* 72 Yale L.J. 694, 695 (1963).

**7.** Through a letter written by his Secretary of State Thomas Jefferson, President George Washington sought advice from the Supreme Court concerning several legal questions to "secure us against errors dangerous to the peace of the United States," and to "insure the respect of all

ically addressed in the Constitution, *see* article IV, section 22, and interpreted by our court: "the Attorney General, a member of the Executive Department, is the only state officer expressly authorized to render such [advisory] opinions." *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644 (1933); *see also* Tex.Const. art. V, § 3 (delimiting Supreme Court's jurisdiction); Tex. Gov't Code Ann. § 402.042 (Vernon 1990) (broadening the Attorney General's power to issue opinion letters).

Because rendering such advice has been constitutionally deemed to be an executive rather than a judicial function, this court has previously refused to issue such opinions even upon request of another court. *See Morrow,* 62 S.W.2d at 644. We have declared unconstitutional an enactment purporting to authorize our offering trial courts prejudgment advice on the constitutionality of state statutes and regulations. *Id.,* 62 S.W.2d at 643–44. More recently, by enacting a resolution submitting a constitutional amendment for citizens' approval to authorize our answering certified questions from federal appellate courts, the Legislature recognized that it could not statutorily confer this court with advisory power.[8]

Today's opinion on rehearing subjects the court to requests for advisory opinions not just from all litigants, but any person who files an amicus brief or writes an editorial. Once a court engages in the business of offering such advice that business will prosper. Today one amicus presents four queries; tomorrow it may be forty.[9] Soon we can expect inquiries con-

cerning our view of a lottery or the methodology for replacing the State Board of Insurance. The volume of opinions issued by the Attorney General, some 193 in 1990 alone, 16 Tex.Reg. 289–92 (1991), suggests the breadth of this task.

More importantly the process in which the court today engages diminishes the quality of our opinions. As Justice Felix Frankfurter noted before his service on the United States Supreme Court:

> The advisory opinion deprives constitutional interpretation of the judgment of the legislature upon facts, of the effective defence of legislation as an application of settled legal principles to new situations, and of the means of securing new facts through the process of legislation.... *[T]o submit legislative proposals to the judicial judgment,* instead of the deliberate decision of the legislature, *is to submit legislative doubts instead of legislative convictions. The whole focus of the judicial vision becomes thereby altered.*

Frankfurther, *A Note on Advisory Opinions,* 37 Harv.L.Rev. 1002, 1005 (1924) (emphasis added).

I am keenly aware of the many obstacles and limitations imposed on members of the Legislature in undertaking the monumental task of restructuring the school finance system. But judges must follow time-honored limitations of a different character. Our function is to uphold the Constitution and, under appropriate circumstances, to refine and develop the common law.[10] It is

---

parties." Letter from Thomas Jefferson to Chief Justice Jay (July 18, 1793), *reprinted in* W. Murphy & C. Pritchett, *Courts, Judges, and Politics* 225–26 (3d ed. 1979). While regretting any embarrassment that might befall the administration, the justices refused his request lest they violate the careful constitutional division of powers. *Id.* at 226.

**8.** Tex.Const. art. V, § 3–c. The necessity for the amendment was explained: "[T]he Texas Supreme Court has determined that under the Texas Constitution judicial power does not embrace giving advisory opinions." Senate Judiciary Committee, Bill Analysis, S.J.R. 10, § 1 R.S. (1985).

**9.** As explained by another legislator: "Once the Court demonstrates its willingness to advise the

legislature on the details of public school finance legislation, the questions will not end." Amicus Brief on Motion for Rehearing, Sen. Carl Parker, at 2. Perhaps to underscore his point he sought our advice in a subsequent filing by posing four questions whose answers would bestow judicial preclearance on specific pending legislation. Motion for Leave to Supplement and Amend Amicus Curiae Brief, Sen. Carl Parker.

**10.** *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *Winters v. Houston Chronicle Publishing Co.,* 795 S.W.2d 723, 725–26 (Tex. 1990) (Doggett, J., concurring).

neither to draft legislation nor to render advisory opinions.

Courts safeguard liberties not only by their action but by their restraint. Through addressing only the questions properly presented in the context of genuine controversies, they preserve public confidence in our third branch of government as an arbiter of real disputes rather than as a clearinghouse for advice on contemporary problems. Respect for judicial authority arises from restraint in its use.

Undoubtedly, to some there is a certain allure to the notion of this court working hand-in-hand with the Legislature as different drafts are submitted for review. Each chapter, section, and sentence could enjoy the careful scrutiny of this court. We could negotiate away any misunderstanding over constitutional requisites perhaps at the same time that the Legislature was resolving the court's budget.

While this approach might result in resolution of one significant problem, it would eventually transform the court into an extension of the Legislature. With its three separate branches of government,[11] our democracy does not always resolve problems in the most expeditious manner. To secure a considered, independent judicial review, we regard some delay acceptable as we sacrifice the gratification immediate answers bring. Disregarding our traditional separation of powers to provide a quick-fix answer undermines the foundation of democracy. Texans excluded from the joint legislative and judicial decision-making process would be denied all opportunity for unbiased judicial review of legislative conduct. Judges would become mere appendages to other branches of government.

Today's opinion demonstrates the danger of overreaching to answer that which has not been properly asked. Our decision on local enrichment in *Edgewood I,* 777 S.W.2d at 397–98, was straightforward, and has been a puzzle primarily to those who preferred not to comprehend it or who disliked what they read. As a postscript to the court's prior unanimous writings, this most recent effort adds more confusion than clarity.

The few generalizations about local supplementation,[12] without supporting legal authority or meaningful analysis, reflect the superficial nature of the court's consideration of this very important question. Nor, despite the court's contrary insinuation, 804 S.W.2d at 493 n. 1, have the parties fully briefed and argued this issue. The movant on rehearing did not, of course, brief a question it did not ask. Fortunately, today's hasty supplement is pure dicta which is in no way binding on this or other courts in the future and is of highly dubious authoritative value. *See Boswell v. Pannell,* 107 Tex. 433, 180 S.W. 593, 596 (1915).

A final reason to avoid the temptation of pontificating is that the court lacks jurisdiction to do so here. By declining to take direct appeal jurisdiction in this cause and "treat[ing] this proceeding as being [solely] in the nature of an original mandamus proceeding to direct the district court to reinstate our injunction," 804 S.W.2d at 493, the court chose not to accept authority to

11. *See* Bruff, *Separation of Powers Under the Texas Constitution,* 68 Tex.L.Rev. 1337, 1337 (1990) ("A strong separation-of-powers tradition is a prominent feature" of Texas constitutional law.).

12. Today's opinion leaves unclear to what extent, if any, legislative enactments can restrict the taxing authority of school districts. If the Texas Constitution bars recapture, 804 S.W.2d 491, why are not other limitations equally flawed? Are legislatively-authorized roll back elections now an unconstitutional interference with local supplementation? Tex.Tax Code Ann. § 26.08 (Vernon 1982 & Supp.1991). Does the opinion on rehearing make unconstitutional the State Property Tax Board, which is authorized to ensure uniformity in local tax appraisal practices and procedures? Tex.Educ.Code Ann. § 11.71 (Vernon 1991). What effect does it have on those provisions historically included in school financing legislation that condition the receipt of certain benefits, such as accreditation, on the levying of a set minimum local tax rate? By apparently barring similar conditions based on state recapture, the opinion casts a constitutional cloud on other traditionally imposed legislative conditions upon taxation by school districts. By writing without considering the ramifications of overbroad and vague statements, the court, intending to grease the legislative works, simultaneously throws in a few wrenches.

address many issues raised in this proceeding, including cross-points brought by the defendants. The opinion in this cause on first hearing carefully sought to observe these jurisdictional limitations, declining to pass on the question of attorney's fees, "which has nothing to do with the enforcement of our mandate," 804 S.W.2d at 493, n. 4, and carefully limiting our consideration of other questions unnecessary to the ultimate issue of enforcement. *Id.* at —— (refusing to address "conflicting prognostications as to whether Senate Bill 1 can or will be implemented to achieve efficiency among 95% of students"). Because we may address only those matters directly affecting enforcement of our prior mandate, the question of local supplementation is not properly before this court. Moreover, a determination of this matter would amount to an inappropriate final resolution of an issue on the merits in a mandamus proceeding that is limited solely to considering whether the trial court abused its discretion. *See Brownson v. Smith,* 93 Tex. 614, 57 S.W. 570 (1900) (refusing to pass on constitutional question that would clarify "the uncertainty which surrounds [the Victoria] school system" because resolution of the issue would not affect whether the writ of mandamus should issue).

The fact that it is racing to publish this opinion before the other branches provide their own solution bespeaks the majority's eagerness to legislate rather than adjudicate. By the public display of disunity and new words of equivocation, today's opinion ensures that this litigation which may be finally nearing an end will go on indefinitely. Neither the Legislature, the parties, nor school districts can act with any assurance concerning what this court will do in the future.

Thankfully Texas judges can be held accountable by the people through the election process. That process, however, has been the source of certain contradictions that have become evident today. Recognizing that Texans do not want even elected judges interfering unnecessarily in their affairs, some candidates have found it increasingly beneficial to identify themselves as proponents of judicial restraint and their opponents as judicial activists. To some, "restraint" is generally synonymous with turning back the clock. In reality, however, for them it is an elastic, self-assumed label describing their judicial conduct, expediently adjusted to fit whatever they wish to write. As they define it, their own conduct is an example of conservatism and restraint, even if, as in this case, it ignores precedent, the rules, and the Constitution. To me, it means—regardless of parties or causes—a reluctance to exceed our constitutional role as judges and a refusal to engage in the type of conscious manipulation that has occurred here. Today's opinion offering advice where none is properly sought represents true activism of the most dangerous type. It reveals the true extent of commitment to restraint by those who sometimes celebrate its virtues so joyously.

MAUZY, J., joins in this concurrence and GAMMAGE, J., joins in this concurrence by separate opinion.

APPENDIX A

# Shift in school financing required

The key question following the Supreme Court's opinion in Edgewood II is, Can we comply with the court's order and still equalize to excellence? The answer is "yes," provided we restructure our school finance system and restructure our schools.

Many people say we have no choice other than a statewide property tax. I strongly disagree.

The best source of revenue for our schools is a broad-based tax that is more predictable in its collection.

The quest for equalized excellence does not end with selecting the source of revenue for our schools. The next step is equally important — distribution of the state funds.

Our current distribution mechanism is flawed. It rewards the wrong actions and does not reward excellence in academic results. For example, we give a school district more money to put a child in vocational education than to keep the student on an academic track. Today, we give a school more money to keep a child in bilingual education than to teach a child to be proficient in English.

A school finance plan that would promote excellence in our schools and meet the guidelines of Edgewood II is as follows:

1. Adopt a constitutional amendment that will tax minerals and utilities on a statewide basis. The extremes in property wealth that exist throughout the state can be traced to the taxation of minerals and major utility installations in sparsely populated regions of Texas.

The existence of this wealth in these pockets aggravates the school finance

Tom Luce

equity problem for the state as a whole. Taxing these resources for the benefit of all Texas schoolchildren would be an important first step toward an equitable solution to the school finance problem.

2. Provide an appropriately funded basic Foundation Program for all Texas students. For too many years, the target that the state set for itself in terms of equalized funding has had little in common with what school districts were actually spending to educate their students.

A basic program moving toward a spending level in the neighborhood of $4,200 per student would be an important step. This would be a single-tier program, with all districts being funded at this level, with state funds adjusted for local wealth.

3. The local share of the basic program would be based on the average property wealth within each county. Even after taxing minerals and utilities at a statewide level, a problem of equity will still exist within many areas.

One solution to this problem would be to have the local share of the basic program be based on the average property wealth of each county, rather than that of the individual school district.

4. Allow unequalized local enrichment

without additional restrictions. After the major disparities in wealth have been eliminated and a sound basic educational program has been established and funded, local districts should be able to enrich their programs and make whatever tax effort they desire to achieve excellence in their schools without the imposition of caps or other restrictions.

The failure to permit local enrichment lays the groundwork for stagnation in public education funding and eventually loss of public support for the system. The extent to which there are educational "leaders" among the state's school districts provides a basis for making future adjustments to the basic educational program, a process the Legislature established in its school finance bill last spring.

To achieve equity without providing any basis for momentum in educational spending and achievement is a short-sighted solution to the school finance problem.

Legal observers disagree as to whether or not the Supreme Court will permit unequalized local enrichment without limitation. Some predict it will not. I believe the court will permit such a plan and, given how important that concept is to excellence in education, the Legislature should do what is best for education and assume the court agrees.

If the justices disagree, they can modify that portion of the plan.

Luce ran for the Republican gubernatorial nomination last year. Next: how to restructure the way our schools operate.

---

# st Pete Rose somewhat misdirected

tive, and Babe Ruth, a hard-drinking roisterer, are more typical.

Rose's thing was gambling. He got caught and paid a price — five months for income-tax cheating along with the permanent ineligible list. The fact he bet on baseball, including possibly his own team, is held most heavily against him.

Keeping him out of the Hall of Fame was more of a matter of self-interest than outrage, however. Baseball operators are afraid he'll tarnish the mom's-apple-pie image they cherish for their enterprise. Abetted by a coterie of writers, who fictionalize the game as a morality play involving athletic skills, they

perpetuate a remarkable myth — a hoax, really — that baseball represents most of what's holy in the American mystique.

It should come as no surprise that the qualities making up a warrior or baseball player are not those commonly found in clergymen or Mother Teresa. Raunchiness is endemic in the military, sports, show business and most other star factories.

None matches baseball for shameless hypocrisy, however, mainly because the others don't profess to be the anchor of national virtue.

Not to put a rap on all myths. Some are harmless and even helpful in retain-

ing marginal civility in a fractious society. George Washington's cherry tree, Santa Claus and the notion that presidents are competent, for example.

But there's a level of rankness at which hypocrisy crashes under its own weight, as recently behind the Iron Curtain. Baseball may be getting perilously close. Rose wouldn't head my candidates for altar boy, but he's a nice, human being than many of those canonized in the Hall of Fame — probably than some of those who voted to keep him out.

Fain is national correspondent for Cox Newspapers.

# School-finance plans take wing in Austin

SAN ANTONIO LIGHT FEB 7 1991

**By EDWARD M. SILLS**
Light Austin bureau chief

AUSTIN – Like paper airplanes in a schoolyard, at least seven school finance plans are being folded, spindled and mutilated before lawmakers decide which one will fly.

Lawmakers are caught between a desire to meet an April 1 deadline imposed by the Texas Supreme Court and uncertainty over what each alternative would mean for the school districts they represent.

Gov. Ann Richards' State of the State speech Wednesday carefully tread a line that did not tip her hand on which plan she supports. In supporting a plan that includes "some form of tax-base consolidation" and redistribution of tax wealth from a few wealthy school districts, Richards could have been describing any of the proposals.

The decisions must come at a breakneck pace, stemming in part from the need for advance notice – probably by the start of March – if voters are asked to decide on a constitutional amendment in May.

"D-Day is coming," Senate Finance Committee Chairman John Montford, D-Lubbock, told finance panel members earlier this week after they heard testimony on the statewide property tax. "Either you come with your plan or we're going to vote this sucker out of here."

All the plans floating in Capitol halls involve an element of what education bureaucrats call "recapture," in which some property tax proceeds from wealthy districts go into a pool that is redistributed to poor school districts. That feature reflects a consensus that the latest Supreme Court decision requires unprecedented changes in the structure of the system.

A major clash is brewing, though, over whether the plan must include "caps" on spending. Again trying to get away from the numbing jargon, the question of the day is this: If a system is set up that provides a good, basic education for everyone, plus an equal opportunity for enriched programs, should local taxpayers get a chance to spend even more? Most of the plans proposed assume that school districts may not have an unlimited right to spend money under the court case.

The final product could include parts of many plans, including these, featured on a chart delivered to the finance panel:

■ **Statewide property tax:** A property tax of at least $1 per $100 valuation replaces varying local school property taxes. It all goes into a pool, from which funds are distributed to school districts on an equal basis. Each district may, at its option, tax up to 25 cents extra for enriched programs, also to be distributed proportionally from a pool to districts that levy the higher taxes. The state would assume bonded indebtedness for facilities and operate a program for future construction. Requires a constitutional amendment.

■ **Single-tier guaranteed yield with recapture:** This plan simply leaves taxing boundaries alone. By redistributing funds, it guarantees that each penny of taxes in each school district yields the same amount of funding. No optional tax for enriched programs. A separate equalized funding system would pay for facilities. Requires a constitutional amendment.

■ **Senate Bill 1 with recapture:** This is the law recently thrown out by the Supreme Court, except tax proceeds to wealthy districts are redirected to poorer districts so as to equalize funding up to the $1.18 tax level. No enrichment program. Separate equalized system for facilities. Requires constitutional amendment.

■ **Tax base consolidation:** This consolidates school district tax bases along county lines to recapture funds from wealthy districts. Wealthy counties could be consolidated into multi-county units. State aid would be used to equalize funding for poor counties. No enrichment tax. Separate equalized facilities funding. No constitutional amendment required.

■ **State Board of Education proposal:** Consolidates school district tax bases into 20 regional service center units (one of which is based in San Antonio) and operates like tax base consolidation proposal, with 80 cents minimum tax. Up to 30 cents enrichment tax, yielding equalized funds, would be available on local option basis. Further taxes permitted, also on equalized basis. Separate 20 cents of tax, again on equalized basis, is available for facilities. No constitutional amendment required.

# Perry redefines 'public servant'

SAN ANTONIO EXPRESS FEB 7 1991

There is an element of gamesmanship in the ethics debate in Austin, the latest being introduction this week of a bill hailed as the toughest yet by the 57 House Republicans who are co-sponsoring it.

That follows the clarion call issued earlier by Texas' top elected Democrats, Gov. Ann Richards and Lt. Gov. Bob Bullock, for ethics reform this legislative session.

Although House Speaker Gib Lewis has been indicted for alleged ethics violations, the Democrat-controlled Legislature has yet to show a consensus on ethics reform. And while allowing he will give the GOP ethics plan a "full hearing," Lewis seems to pooh-pooh ethics reform.

"Everybody's on that (ethics) bandwagon," he says. "It's good, kind of like apple pie, motherhood, the American flag and Desert Shield."

If ethics reform slips into the quagmire of politics, it's dead. That is why we like new Texas Agriculture Commissioner Rick Perry's unilateral example this week in presenting a no-nonsense "Standards of Conduct" to Agriculture Department employees. It immediately made the department a model to which other state agencies should aspire.

To add teeth and wisdom to the standards, Perry installed veteran lawman Larry Beauchamp in a new position, special assistant to the commissioner for ethical affairs.

Beauchamp will advise Agriculture Department employees, but Perry emphasized that the standards are common-sense ones that leave no "gray area" — no winking and grinning at what's right and what's wrong.

While some of the lobbyists, elected officials and other camp followers in Austin might not like this ethics "bandwagon," a lot of Texans don't like people who call themselves "public servants" and then gorge themselves at the public trough.

Perry stresses that his staff "must act at all times with the highest levels of integrity and must avoid any appearance of impropriety."

Public servants who snicker at that kind of language ought to get off the public dole and out of the way of ethics reform. Taxpayers are sick of business as usual.

# Tax plan to envelop more businesses

HOUSTON CHRONICLE FEB 7 1991

**By R.G. RATCLIFFE**
Houston Chronicle Austin Bureau

AUSTIN — Many Texas businesses could find themselves paying a new tax next year under a proposal Gov. Ann Richards made Wednesday in her State of the State address to the Legislature.

Richards, carrying through on a campaign pledge, said she will reactivate the Select Committee on Tax Equity. The panel's top goal, she said, will be to find a way to overhaul the Texas franchise tax.

"We must recover the dollars lost from our franchise tax. It is unfair. It is unreliable and it causes more than its share of headaches," Richards said.

"It is such a mess that by 1993, it will have cost us $2.3 billion in tax refunds."

The tax equity committee in its report to the 1989 Legislature said tax fairness would mean extending the franchise tax to numerous businesses not now taxed. Those include proprietorships, partnerships, business trusts, professional associations and professional corporations.

The committee also made several recommendations for overhauling the franchise tax. But only some patches were placed on the tax to accommodate lawsuits that had been won against the state by Shell Oil Co., Sage Energy Co. and Sun Oil Co.

The tax puts its burden on capital-intensive industries. The tax now is $5.25 per $1,000 of taxable capital, which is the number of issued company shares times the par value set by the company. The minimum tax payment for all corporations doing business in Texas is $55 a year.

The last tax equity committee said the tax should be restructured to de-emphasize capital so that more businesses will be willing to invest in Texas. But it said the tax should not be turned into a gross receipts tax or a corporate income tax.

While the committee recommended a broad-based and restructured franchise tax, it offered few specifics on how that should be achieved.