# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-01-00491-CV

**West Orange-Cove Consolidated Independent School District; Coppell Independent School District; La Porte Independent School District; and Port Neches-Groves Independent School District, Appellants**

**v.**

**Felipe Alanis, Texas Commissioner of Education; The Texas Education Agency; Carol Keeton Rylander, Texas Comptroller of Public Accounts; and The Texas State Board of Education; Alvarado I.S.D.; Anthony I.S.D., Aubrey I.S.D.; Bangs I.S.D.; et al., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GV100528, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING

Four school districts led by West Orange-Cove Consolidated Independent School District (West Orange-Cove) appeal the dismissal of their action seeking a declaratory judgment that the present school finance system is unconstitutional.[1] The interested parties include Felipe Alanis,[2] Commissioner of Education, the Texas Education Agency, the Comptroller of Public Accounts, and the Texas State Board of Education (collectively "the State"), and two groups of intervening school

---

[1] We will refer to appellants collectively as West Orange-Cove.

[2] Jim Nelson was the Commissioner of Education when this appeal was submitted; he has since resigned. Felipe Alanis was sworn in as Commissioner of Education on March 25, 2002 and is automatically substituted as appellee. *See* Tex. R. App. P. 7.2(a).

districts, collectively the Alvarado intervenors and the Edgewood intervenors, who are generally aligned with the State. We will affirm the judgment of the trial court.

## BACKGROUND

The current educational financing system was crafted in response to several federal and state constitutional challenges to the long-standing school financing plan and to the initial attempts to correct the identified constitutional infirmities. The first attacks were brought in federal court;[3] ultimately, however, the challenges have been pursued through the state courts. In 1989, the Texas Supreme Court held the school finance system unconstitutional because it violated the following constitutional mandate: "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 393 (Tex. 1989) (*Edgewood I*) (citing Tex. Const. art. VII, § 1). The basis of the court's holding were the gross disparities among the schools throughout the state caused by the system's heavy reliance on local property taxes to provide educational funds. *Id.* at 392-93. At the time of the *Edgewood I* decision, local ad valorem taxes accounted for half of all available educational funds. *Id.* at 392.[4] As the

---

[3] *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 55 (1973) (reversing lower court decision holding that Texas school financing system violated the Equal Protection Clause of the Fourteenth Amendment).

[4] Despite reforms to the system discussed *infra*, the state's reliance on local property taxes to fund the educational system continues. The supreme court has remarked that once used merely to "supplement" state funding, "local ad valorem taxes now are expected to provide most of the basic needs of education." *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 494 (Tex. 1992) (*Edgewood III*). The system's dependence on local revenue has been a persistent problem that was recognized as early as seventy years ago: "The inequality of

2

amount of revenue that can be raised by property taxes depends on the property wealth within each district, there were staggering differences between the state's poorest and wealthiest districts. *Id.*

> The wealthiest district has over $14,000,000 of property wealth per student, while the poorest has approximately $20,000; this disparity reflects a 700 to 1 ratio. The 300,000 students in the lowest-wealth schools have less than 3% of the state's property wealth to support their education while the 300,000 students in the highest-wealth schools have over 25% of the state's property wealth; thus the 300,000 students in the wealthiest districts have more than eight times the property value to support their education as the 300,000 students in the poorest districts.

*Id.*

Stating that the purpose of an "efficient system" as that term is used in the constitution was to provide for a "*general* diffusion of knowledge," *id.* at 396, the court noted that the then-present system "provides not for a diffusion that is general, but for one that is limited and unbalanced," *id.* "The resultant inequalities," the court concluded, "are thus directly contrary to the constitutional vision of efficiency." *Id.* In addition, the court found that the system was *financially* inefficient because property-rich districts could generate substantial revenues at low tax rates, while property-poor districts had to tax at high rates "merely to spend low." *Id.* at 393. The low rates of property-rich districts also allowed valuable sources of the available tax base to be underutilized; thus, additional revenues were consistently lost to the system. *Id.* The court noted that many wealthy districts had become "tax havens" and that "if forced to tax at just average tax rates, these districts

---

educational opportunities in the main arises from natural conditions. . . . The type of school which any community can have must depend upon the population of the community, the productivity of its soil, and generally its taxable wealth." *Mumme v. Marrs*, 40 S.W.2d 31, 36 (Tex. 1931). The problem remains despite attempts to lessen the dependence on local property taxes as a source of revenue. *See generally Edgewood III*, 826 S.W.2d at 494-498.

3

would generate additional revenues of more than $200,000,000 annually for public education." *Id.* The court held that the system violated the Constitution because it was "neither financially efficient nor efficient in the sense of providing for a 'general diffusion of knowledge' statewide," and exhorted the legislature to fulfill its obligation to provide an efficient system. *See id.* at 397.

The first legislative attempt to do so failed. In *Edgewood II*, the court struck down the legislation, holding that the system remained in violation of section one of article VII. *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491, 498 (Tex. 1991) (*Edgewood II*). The court noted that while the legislation had made some reforms to the system, it left intact the same funding scheme "with the same deficiencies we reviewed in *Edgewood I*." *Id.* at 495. "Even if the approach of Senate Bill 1 produces a more equitable utilization of state educational dollars, it does not remedy the major causes of the wide opportunity gaps between rich and poor districts." *Id.* at 496. The court noted that the proposed system

> does not change the boundaries of any of the current 1052 school districts, the wealthiest of which continues to draw funds from a tax base roughly 450 times greater per weighted pupil than the poorest district. It does not change the basic funding allocation, with approximately half of all education funds coming from local property taxes rather than state revenue. And it makes no attempt to equalize access to funds among all districts.

*Id.* The court reiterated that "[t]o be efficient, a funding system that is so dependent on local ad valorem property taxes must draw revenue from all property at a substantially similar rate." *Id.* Emphasizing that "'[a] Band-Aid will not suffice; the system itself must be changed,'" *id.* at 498 (quoting *Edgewood I*, 777 S.W.2d at 397), the court held that the proposed scheme continued to violate article VII, section one, *id.*

4

The Legislature's next attempt to craft an "efficient" system ran into an independent constitutional obstacle. In *Edgewood III*, the court reviewed a challenge that was based not on the ground that the legislative design was inefficient,[5] but rather on the ground that it imposed a state ad valorem tax in violation of article VIII, section 1-e. *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 502 (Tex. 1992) (*Edgewood III*) ("while the Legislature has some latitude in the manner it chooses to discharge its duty to establish and maintain an efficient public school system, it cannot go so far as to violate another constitutional provision in attempting to comply with article VII, section 1."). In an attempt to ameliorate disparities while retaining the historical dependence on local ad valorem taxes, the legislation created 188 county education districts, or "CEDs," which were composed of school districts. *Id.* at 498. The CEDs had no educational duties; rather, the CEDs were created to perform what had heretofore been the districts' responsibility to administer local ad valorem taxes. *Id.* The CEDs had little discretion in fulfilling this duty. The CEDs did not determine their own tax rates but instead "lev[ied], collect[ed], and distribute[d] property taxes as directed by the Legislature." *Id.*

The state constitution generally authorizes local ad valorem taxes, which are taxes in proportion to the property's value, but when the State imposes an ad valorem tax, it violates article VIII, section 1-e. *See* Tex. Const. art. VIII, §§ 1(b); 1-e. Various school districts and individual citizens complained that the State effectively levied a state ad valorem tax because the CEDs lacked the discretion. *Edgewood III*, 826 S.W.2d at 500. The court agreed, emphasizing the indicia of state rather than local control over the ad valorem tax:

---

[5] The court specifically stated that the issue of the constitutional standard of efficiency was not before it. *Carrollton-Farmers Branch* (*Edgewood III*), 826 S.W.2d at 494.

Senate Bill 351 mandates the tax CEDs levy. No CED may decline to levy the tax. The tax rate for all CEDs is predetermined by Senate Bill 351. No CED can tax at a higher rate or a lower rate under any circumstances. Indeed, the very purpose of the CEDs is to levy a uniform tax statewide.

*Id.* In holding that this CED scheme constituted an unconstitutional ad valorem tax, the court set forth the following test:

An ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion. How far the State can go toward encouraging a local taxing authority to levy an ad valorem tax before the tax becomes a state tax is difficult to delineate. Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in it own behalf or through an intermediary. Between these two extremes lies a spectrum of other possibilities.

*Id.* at 502-03.

In response to the court's decision, the Legislature crafted a system that attempted to comply with the constitutional directive of efficiency without impinging on the proscription against state property taxes.[6] Finally, in *Edgewood IV*, the court held that the legislature had created a funding system that passed constitutional muster. *See Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 750 (Tex. 1995) (*Edgewood IV*). All sides to the present dispute agree that the current

---

[6] *See* Act of May 28, 1993, 73d Leg., R.S., ch. 347, §§1.01-9.02, 1993 Tex. Gen. Laws 1479.

6

school finance system is essentially the same system upheld by the court in *Edgewood IV*. A brief overview of the current provisions is helpful to an understanding of that decision.

The financing mechanisms presently in place seek to ensure that every district has adequate resources to provide an accredited education and "substantially equal access to funds to provide an enriched program" and additional funds for facilities. Tex. Educ. Code Ann. § 42.002(b) (West Supp. 2002). These goals are implemented by the "Foundation School Program" (the Program), which establishes two "tiers" of funding for participating districts. *Id.* To be eligible to participate in the Program, a district must set its maintenance and operations tax at a rate of at least $0.86 per $100 valuation of property.[7] *Id.* §§ 42.252; 45.002; 45.003 (West 1996 & Supp. 2002). In return, the district receives for every student a "basic allotment" of $2,537. *Id.* §§ 42.101; 42.252 (West Supp. 2002).[8] This is known as "Tier one" of the Program. The schools, however, may tax at a rate that exceeds $0.86 per $100 of property. Under the "Tier two" provisions, every district that taxes at a rate of more than $0.86, up to the maximum rate of $1.50, receives an additional amount for "enrichment" and for school facilities. *Id.* §§ 42.302; 45.003. For each penny that the

---

[7] In addition to the "maintenance and operations tax," a school district may also levy ad valorem taxes to service bonds issued to pay for the construction of school buildings, the acquisition or refinancing of property, the purchase of land for school buildings, and the purchase of new school buses. Tex. Educ. Code Ann. § 45.001 (West Supp. 2002). The $1.50 cap does not apply to the rate of taxes levied to service the bonds, which may be set at any rate sufficient to pay the principal and interest on the bonds. *Id.* § 45.003.

[8] This amount is subject to increase by way of legislative appropriations. Tex. Educ. Code Ann. § 42.101 (West Supp. 2002).

tax is set above $0.86, subject to the $1.50 cap, the district receives a guaranteed yield of $25.81 per each student. *Id.* § 42.302.[9]

In *Edgewood IV*, the supreme court reviewed the current financing scheme in terms of efficiency, as it had done in the first two *Edgewood* opinions, and in terms of "revenue," that is, the "mechanisms through which [the system] provide[d] the funds to achieve efficiency," as it had done in *Edgewood III.* 917 S.W.2d at 734. The court examined the current provisions in light of the many issues raised by the efficiency and revenue challenges. A consistent theme of the court's extensive analysis is that the relevant measuring stick for the system is the accredited education, which the court equated with the constitutional term a "general diffusion of knowledge." *See id.* at 730 (noting that in the legislation authorizing the current school financing scheme, the "Legislature equates the provision of a 'general diffusion of knowledge' with the provision of an accredited education"); *see also id.* at 731 n.10 (stating that "accreditation standards . . . [are] the legislatively defined level of efficiency that achieves a general diffusion of knowledge"). That is, whether the court was discussing the efficiency of the system or the revenue mechanisms, the court's focus was on the system's ability to provide a general diffusion of knowledge.

The court first concluded that the legislation was both educationally and financially efficient because it ensured a general diffusion of knowledge, or accredited education, for all students. *Id.* at 730-31. The court noted that in addition to making financial reforms, the legislation which forms our present system also made significant educational reforms to the Education Code by establishing an "accountability regime" that emphasizes academic achievement. *Id.* at 728-29. The

---

[9] This amount is also subject to increase by way of legislative appropriations. Tex. Educ. Code Ann. § 42.302 (West Supp. 2002).

8

court concluded that the accountability regime fulfilled the legislature's "constitutional obligation to provide for a general diffusion of knowledge statewide." *Id.* at 730. The court also found that the system was financially efficient because both tiers of funding allowed every school district to provide a general diffusion of knowledge:

> Based on the evidence at trial, the district court found that meeting accreditation standards, which is the legislatively defined level of efficiency that achieves a general diffusion of knowledge, requires about $3,500 per weighted student. After adjustments, the Tier 1 allotment provides, on average, only $2,537 per weighted student. Tier 2, however, enables a district to add up to $1,315.20 to this amount ($20.55 per cent of tax[10] times 64 cents [i.e., the difference between 1.50 and 0.86]). Thus, the district court found that every district can provide an accredited education with funding provided by Tiers 1 and 2.

*Id.* at 731 n.10.[11] Thus, the educational and financial efficiency of the system, judged by its ability to provide students with a general diffusion of knowledge, met the constitutional standard.

Similarly, the financing *mechanisms* through which this efficiency was achieved, when measured in terms of the districts' ability to meet the state-required accredited education, did not *violate* any constitutional provisions. *Id.* at 750. Of particular relevance to this appeal is the court's conclusion that the tax provisions enabled all districts to provide an accredited education for their students without violating the constitutional prohibition on state taxes. *See id.* at 738. The court

---

[10] The current number is $25.81 per every cent between $0.86 and $1.50. Tex. Educ. Code Ann. § 42.302 (West Supp. 2002).

[11] The court also found the system efficient because, relevant to concerns raised in *Edgewood I* and *Edgewood II*, the system provided students with "substantially equal access to the [available] funds"; significantly, the court stated that the legislation decreased the disparity in access to funds from the 700 to 1 ratio that existed at the time of *Edgewood I* to a ratio of 28 to 1. *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 730-31 (Tex. 1995).

9

found that while the tax provisions did not allow the districts total discretion, the tax was unlike the CED scheme struck down in *Edgewood III*. The current tax system, according to the court, "lies somewhere in that 'spectrum of possibilities'" recognized in *Edgewood III*. *Id.* at 737 (citation omitted). "To receive any Foundation School Fund payments at all, a district must tax at an effective rate of at least $0.86. [The legislation] does not, however, mandate a set rate or prescribe the distribution of the proceeds. While a district may maximize its state aid by taxing at $1.50, there is no requirement that it do so." *Id.* The court acknowledged that the legislature had imposed a minimum and a maximum rate of tax for maintenance and operations, but stated that "the imposition of such limits does not render [the system] unconstitutional. *Id.* Within these limits, the statute afforded the districts a range of possible tax rates, thus leaving them meaningful discretion. *Id.* at 737-38.

The court stated that "[a]lthough financial incentives for property-poor districts and the desire to maintain previous levels of revenue in the property-rich districts may *encourage* districts to tax at the maximum allowable rate, the State in no way requires them to do so." *Id.* at 738. A state ad valorem tax issue would only arise, the court opined, if districts were forced to tax at the maximum rate to fulfill the state-mandated requirement of providing an accredited education, or, in the parlance of *Edgewood IV*, a general diffusion of knowledge. The court explained that the tax cap might become both the "floor" and the "ceiling" if the cost of providing an accredited education was the same as the maximum amount of revenue that could be raised, i.e., the $1.50 cap. *Id.* at 738. If forced to tax at the maximum allowable rate to meet a state obligation, a district would be unable to exercise any meaningful discretion. Assuming this hypothesis, the tax might then constitute an unconstitutional state tax:

10

[I]f the cost of providing for a general diffusion of knowledge continues to rise, as it surely will, the minimum rate at which a district must tax will also rise. Eventually some districts may be forced to tax at the maximum allowable rate just to provide a general diffusion of knowledge. If a cap on tax rates were to become in effect a floor as well as a ceiling, the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable because the districts would then have lost all meaningful discretion in setting the tax rate.

*Id.*

### *The Instant Dispute*

West Orange-Cove believes that the court's warning has materialized due to rising costs of educating students and that the $1.50 cap has now become the floor as well as the ceiling. West Orange-Cove asserted that it is forced to tax at or near the $1.50 cap "to educate its students," and that barring the declaratory relief it seeks, it will have to continue to take cost-saving measures such as eliminating teaching positions, cutting programs, and increasing class sizes.[12] It asked the trial court to declare that the tax approved in *Edgewood IV* has become an unconstitutional state ad valorem tax.

Alvarado intervened and filed special exceptions to West Orange-Cove's pleadings, asserting that they failed to state a viable cause of action because the districts had pleaded only that

---

[12] West Orange-Cove's first amended petition, the live petition at the time of hearing, requested the following relief:

Accordingly, Plaintiffs request that the Court enter a judgment declaring that the $1.50 statutory cap on M&O tax rates constitutes an unconstitutional statewide ad valorem tax. This constitutional deficiency cannot be cured simply by raising the statutory cap, because such a solution would only aggravate the State's overreliance on local property taxes as a means of financing the school system. Rather, Plaintiffs request that the State assume a greater responsibility for financing the school system and end its overreliance on the local property tax.

11

they were forced to tax at the cap to "educate their students." According to Alvarado, the only relevant inquiry regarding the tax was a district's ability to meet the state-mandated accredited education within the allowable range. Alvarado insisted that because the districts had failed to allege that they were "required to adopt a $1.50 tax rate in order to provide the constitutionally-required general diffusion of knowledge to their students," they had failed to allege an essential element of their cause of action and urged the court to dismiss the claim.[13]

West Orange-Cove responded to the special exceptions. It also amended its original petition, but did not add any allegation that it was forced to tax at or near the maximum rate to provide an accredited education. A hearing was held at which Alvarado urged its special exception on June 28, 2001. On July 24, 2001, the district court signed a modified final order dismissing the case on special exceptions, finding that West Orange-Cove had failed to state a cause of action.[14]

**DISCUSSION**

**I. Failure to State a Claim**

*Standard of Review*

The Alvarado intervenors sought dismissal of the suit by way of special exceptions on the ground that West Orange-Cove had failed to state a cognizable cause of action by omitting a

---

[13] Although the special exceptions filed by Alvarado were designated to be included in the record for appeal, they were not included in our record. Nonetheless, West Orange-Cove's response to Alvarado's special exceptions, in which it quotes from Alvarado's pleading, is in our record, as is a transcript of the hearing on the plea to the jurisdiction and the special exceptions, at which Alvarado appeared and urged its special exception.

[14] The district court also granted the State's plea to the jurisdiction on ripeness grounds. This issue will be discussed *infra*.

necessary element. A special exception is a proper method to determine whether a plaintiff has pleaded a cause of action. *Butler Weldments Corp. v. Liberty Mut. Ins. Co.*, 3 S.W.3d 654, 658 (Tex. App.—Austin 1999, no pet.). When special exceptions are sustained, the pleader may either amend the petition or refuse to amend and challenge the ruling on appeal. *Id.*; *Detenbeck v. Koester,* 886 S.W.2d 477, 479 (Tex. App.—Houston [1st Dist.] 1994, no writ). Although a trial court should normally give a party the opportunity to amend the pleading, it need not do so if the pleading defect is of a type that amendment cannot cure, such as a pleading that asserts an unrecognized cause of action. *Slentz v. American Airlines, Inc.*, 817 S.W.2d 366, 369 (Tex. App.—Austin 1991, writ denied); *Sepulveda v. Krishnan*, 839 S.W.2d 132, 134 (Tex. App.—Corpus Christi 1992), *aff'd*, 916 S.W.2d 478 (Tex. 1995).

Here, the trial court did not give West Orange-Cove an opportunity to replead; as it stated in its final order, however, the court determined that the alleged defect was of a type that amendment cannot cure. The court also stated that it understood from the hearing that West Orange-Cove wished to stand on its pleadings. Our review of the record indicates the correctness of the trial court's determination that West Orange-Cove either could not, or did not seek to amend its pleadings. West Orange-Cove responded to Alvarado's special exceptions by stating that it had implicitly pleaded that it was forced to tax at or near the cap to provide a general diffusion of knowledge and that its first amended petition made clear that the districts had alleged that they were forced to tax at or near the cap "'to educate students in their districts,' i.e., to provide a general diffusion of knowledge." West Orange-Cove continued, then, to couch its argument in terms of its ability to educate students rather than its obligation to provide an accredited education. West Orange-Cove's arguments at the hearing confirm the trial court's conclusion. West Orange-Cove's

position was that it could not, or soon would be unable to, furnish the kind of education it wanted to provide at the cap. West Orange-Cove simply does not complain that it is unable to meet the state obligation to provide a general diffusion of knowledge as that term has been defined to mean an accredited education.

When a trial court dismisses a case upon special exceptions for failure to state a cause of action, we review that issue of law using a *de novo* standard of review. *Butler Weldments*, 3 S.W.3d at 658; *Sanchez v. Huntsville Indep. Sch. Dist.,* 844 S.W.2d 286, 288 (Tex. App.—Houston [1st Dist.] 1992, no writ). When reviewing a dismissal based upon special exceptions, we also must accept as true all material factual allegations and all factual statements reasonably inferred from the allegations set forth in the respondent's pleadings. *See Sorokolit v. Rhodes*, 889 S.W.2d 239, 240 (Tex. 1994). If a pleading does not state a cause of action, the trial court does not err in dismissing the case. *Butler Weldments*, 3 S.W.3d at 658.

As did the supreme court in its review of the school finance system, we begin with the presumption that the statutory provisions under attack are constitutional; the burden of proof is on the party challenging this presumption. As *Edgewood III* indicates, in determining whether a tax is a state ad valorem tax, one compares the discretion afforded the local taxing authority with the control exercised by the State. 826 S.W.2d at 500-03. "If the State mandates that a tax be levied, sets the rate, and prescribes the distribution of the proceeds, the tax is a state tax . . . ." *Id.* at 500. The lack of discretion left to local taxing authorities was fatal to the taxing legislation at issue in that case. *Id.* at 502-03. The court's test focuses on the amount of control exercised by the State over the tax. If the control is complete, the taxing authority has no discretion in levying the tax; rather, it taxes at the direction of and in the manner prescribed by the State. In contrast, if the taxing

14

authority has discretion, the State cannot be said to be controlling the levy. *See Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n & Subsequent Injury Fund*, No. 00-1114, slip op. at 17-18, 2002 Tex. LEXIS 38, at *28 (Tex. Apr. 4, 2002) ("An ad valorem tax is a prohibited tax under section 1-e when the State directly imposes it, or when a political subdivision imposes it but the State indirectly controls the tax revenues' levy, assessment, and disbursement so that the political subdivision lacks any meaningful discretion over these factors.").

In determining the State's control over the maintenance and operations property tax, the relevant inquiry is the relationship between the tax and the districts' obligations to provide an accredited education. As the court found in *Edgewood IV*, the system may encourage districts to tax at or near the maximum rate. Whether it does so is irrelevant for purposes of determining whether the system imposes a state tax. But if the districts' abilities to fulfill a state mandate, here the obligation to provide the minimum accredited education, forced the districts to tax at the maximum rate, the system might approach an unacceptable level of state control over the levy. Therefore, the allegation that a district is forced to tax at the highest allowable rate to provide the bare, accredited education is a necessary element of a cause of action brought by a district challenging the cap. West Orange-Cove instead pleaded that it was forced to tax at or near $1.50 to "educate its students." The enriched education that West Orange-Cove locally desires to provide its students is not the measure for determining if the State is imposing an educational mandate that requires the local district to levy a state-imposed rate of tax. West Orange-Cove's pleadings simply fail to state a viable cause of action.

West Orange-Cove argues that by alleging to "educate its students" it means "to provide a general diffusion of knowledge." But in *Edgewood IV*, the supreme court equated the term

15

"general diffusion of knowledge" with a minimum accredited education. Ignoring this obstacle, West Orange-Cove argued at the hearing before the trial court that the term is ambiguous and its meaning should be litigated. The following exchange at the hearing evidences West Orange-Cove's position:

> The court: What is a general diffusion of knowledge?
>
> Plaintiffs' counsel: We want to take discovery. We don't want to lose at this first level. We want to take discovery. We want to hire experts. We want to look at the State's numbers. The State has already said it's conclusive. It's already finished. You can't argue with it. They say that the general cost of diffusion in the state of Texas is $4,167. And that is a $600 increase over the $3500 that was in Footnote 10 seven years ago. We have grave questions. That number is unacceptably low now. We want to ask: What goes into that? What has not been included?
>
> * * *

As the record makes clear, West Orange-Cove wants to use this opportunity, framed as a tax challenge, to engage the judiciary in a debate over policy choices that are within the province of the legislative branch. Both the Legislature and the supreme court have equated the term "general diffusion of knowledge" with accreditation standards. The court, in addition, has insisted that the judiciary has a limited role in the area of educational policy and should defer to the Legislature on matters involving educational standards and funding:

> This Court's role under our Constitution's separation of powers provision should be one of restraint. We do not dictate to the Legislature how to discharge its duty. As prominent as this Court's role has been in recent years on this important issue, it is subsidiary to the constitutionally conferred role of the Legislature. The people of Texas have themselves set the standard for their schools. Our responsibility is to decide whether that standard has been satisfied, not to judge the wisdom of the policy choices of the Legislature, or to impose a different policy of our own choosing.

16

*Edgewood IV*, 917 S.W.2d at 726. West Orange-Cove's claim would involve the courts in deciding what is meant by the term "general diffusion of knowledge" without reference to the accreditation standards set by the Legislature. That body, however, has conclusively equated the two concepts, thereby foreclosing the judicial inquiry West Orange-Cove seeks to pursue. Moreover, as the supreme court has recognized, the meaning of a "general diffusion of knowledge" and the development of appropriate accreditation standards are policy choices best suited to the legislature. *Id.*

West Orange-Cove's argument aside, this court is left with its pleading that it must tax at the cap to "educate its students." This allegation does not refer to the districts' state-imposed obligation to provide an accredited education; as such, the districts' pleadings fail to state a challenge to the tax as a *state* tax. Accordingly, we hold that the trial court properly dismissed the claim for failure to state a cause of action.

## II. Ripeness

In an abundance of caution, we will also address West Orange-Cove's second and third issues regarding ripeness. Ripeness implicates subject-matter jurisdiction and emphasizes the requirement that one must have a concrete injury to present a justiciable claim. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000); *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998). Ripeness concerns when an action may be brought. *Patterson*, 971 S.W.2d at 442. In order for a party to present a justiciable controversy, facts must be sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Id.*; *Texas Dep't of Banking v. Mount Olivet Cemetary Ass'n*, 27 S.W.3d 276, 282 (Tex. App.—Austin 2000,

17

pet. denied). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Patterson*, 971 S.W.2d at 443. A person need not have incurred actual injury; a declaratory judgment action will lie if the facts present "ripening seeds of a controversy." *Mount Olivet*, 27 S.W.3d at 282 (quoting *Texas Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153-54 (Tex. App.—Austin 2000, no pet.)). Such a situation arises "where the claims of several parties are present and indicative of threatened litigation in the immediate future which seems unavoidable, even though the differences between the parties as to their legal rights have not reached the state of an actual controversy." *Id.*

In its plea to the jurisdiction, the State urged the court to dismiss the suit on the grounds of ripeness. The State argued that the supreme court in *Edgewood IV* was concerned with the statewide financing system, hence, the tax might become unconstitutional only if the ceiling became the floor "as to all districts." The declaratory action brought by West Orange-Cove, the State urged, was premature because West Orange-Cove had pleaded only that it and three other districts were unable to exercise discretion in setting their tax rates and had failed to plead facts that demonstrated a system-wide lack of discretion. Additionally, the State provided evidence that the majority of school districts in the state elect tax rates below the cap. Thus, the State reasoned, West Orange-Cove's claim that the levy had become an unconstitutional state tax was not yet ripe.

The district court concluded that the number of districts that were taxing at the cap was determinative of whether West Orange-Cove's claims were ripe and that a cause of action would be ripe only if West Orange-Cove could demonstrate that at least half of all districts had tax rates at $1.50. The court explained its view that "[f]or the legislative design to be an unconstitutional state ad valorem tax, the design must require a significant number of districts to tax at the cap, something

18

approaching or exceeding half the districts." In its order, the district court stated that eighty-one percent of districts taxed at rates under $1.50 and only nineteen percent taxed at the cap. The court, however, also excluded those districts that taxed at $1.50 but provided the voluntary homestead exemption[15] because by electing not to tax one hundred percent of available property, those districts had demonstrated meaningful discretion in setting local tax rates. In addition, the court explained, by exempting or sheltering twenty percent of property from taxation, the districts decreased the amount of available revenue and, in effect, lowered the tax rate. Thus, districts taxing at $1.50 while providing the homestead exemption were not truly taxing at the $1.50 cap. Once such districts were excluded, the district court concluded that the number of districts "truly" taxing at the cap, that is, taxing at the rate of $1.50 without granting the optional exemption, totaled only 12.19 percent of districts in the state. The court then concluded that because fewer than fifty percent of all districts taxed at the maximum rate, West Orange-Cove's pleadings failed to present a ripe claim under *Edgewood IV*.

West Orange-Cove advances several arguments in support of its position that its request for a declaratory judgment is ripe. First, it argues that the trial court's ripeness analysis focused on the presence of an actual injury without considering injuries "likely to occur" or "ripening seeds of injury." *See Patterson*, 971 S.W.2d at 442; *Mount Olivet*, 27 S.W.3d at 282. In the alternative, it contends that in considering whether West Orange-Cove had demonstrated an actual injury, the trial court erred by determining that a claim would be ripe only if a plaintiff could show that half of all districts were forced to tax at the cap and by excluding those districts that had granted

---

[15] *See* Tex. Const. art. VIII, § 1-b ("Residence Homestead Exemption").

19

the optional homestead exemption. Last, West Orange-Cove argues that even if the court's analysis were correct that ripeness for the purposes of West Orange-Cove's claim required a showing of a systemic problem, its claim was ripe because the fact that twelve percent of districts, or one district out of every eight, is taxing at the maximum rate indicates a sufficiently widespread problem with the tax scheme.

The parties frame their arguments on appeal in the context of the trial court's reasoning that the number of districts, rather than the amount of state control, determines whether this suit is ripe. For example, West Orange-Cove has divined significance in the language of the isolated passage in *Edgewood IV*, emphasizing the word "some" in the following sentence: "Eventually, *some* districts may be forced to tax at the maximum allowable rate just to provide a general diffusion of knowledge." 917 S.W.2d at 738 (emphasis added). West Orange-Cove argues that the word "some" indicates that the tax could become a state ad valorem tax as long as "some" districts, even a minority, were taxing at the maximum rate. The State disagrees with West Orange-Cove's reasoning and argues that the court was concerned with the possibility of *all* districts being forced to tax at the maximum rate to provide an accredited education. The State focuses on the next sentence of the opinion, which reads: "If a cap on tax rates were to become in effect a floor as well as a ceiling, the conclusion that the Legislature had set a *statewide* ad valorem tax would appear to be unavoidable . . . . " *Id.* (emphasis added).

As we explained above, the controlling factor in reviewing a challenge to an alleged ad valorem tax is the State's involvement in the levy. Whether the effect of the tax is experienced "*statewide*" or by a majority of districts in the state does not determine whether a tax is a state tax. Seen in this light, the positions taken by the district court in its order dismissing the case on ripeness,

and by the parties in their briefs, are based on a misunderstanding of the determinative factors of a state ad valorem tax. The instant case is not unripe because fewer than half of all school districts are taxing at the maximum rate; rather, the claim is unripe because the appellants have failed to demonstrate that they are forced to set their rates of tax at the maximum allowable rate just to provide an accredited education. That is, the districts have not pleaded that they have lost all meaningful discretion in setting the rate of tax as it pertains to their ability to meet a state-imposed obligation, which is the only relevant concern in this lawsuit.

Therefore, because the districts have not asserted that the State, by requiring districts to provide an accredited education, has effectively forced them to tax at the cap, their claim that the cap is an unconstitutional state-imposed and state-controlled ad valorem tax is not ripe. Because of our resolution of this issue we need not discuss West Orange-Cove's arguments complaining of the analysis employed by the district court in its final order.

## III. Judicial Notice

West Orange-Cove filed a motion requesting that we take judicial notice of certain information regarding the tax rates currently set by school districts. Specifically, it asks us to take official notice of the rates of tax set by school districts for the 2001-02 year, as well as figures relating to homestead elections made by the districts and student enrollment figures. West Orange-Cove states that the data relied on by the trial court in determining that the case was not ripe, and figures cited by West Orange-Cove in its brief, were based on tax rates during the previous fiscal year. The data offered by West Orange-Cove indicates that, if correct, the percentage of districts taxing at the maximum rate has increased for the 2001-02 fiscal year. West Orange-Cove argues that this Court

should consider the new data in determining whether its claim is now ripe. Our resolution of the ripeness question, however, makes the additional data of little relevance. That is, because we hold that the accredited education requirement, a state-imposed mandate, not the number of districts, determines whether West Orange-Cove's claim is ripe, any increase in the number of districts taxing at the cap does not affect our analysis. Moreover, we hold that the information which West Orange-Cove requests we judicially note does not comply with the requirements of Rule of Evidence 201. *See* Tex. R. Evid. 201 (authorizing the taking of judicial notice under appropriate circumstances). Specifically, we hold that the information is neither "(1) generally known within the territorial jurisdiction of the trial court [n]or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tex. R. Evid. 201(b). Accordingly, we overrule appellants' motion to take judicial notice.

## CONCLUSION

Having found that the trial court properly dismissed appellants' claim for failure to state a claim and on the grounds of ripeness, we affirm the judgment.

_

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: April 11, 2002

Publish