TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00491-CV






West Orange-Cove Consolidated Independent School District; Coppell Independent School


District; La Porte Independent School District; and Port Neches-Groves


Independent School District, Appellants



v.



 Felipe Alanis, Texas Commissioner of Education; The Texas Education Agency; Carol


Keeton Rylander, Texas Comptroller of Public Accounts; and The Texas


State Board of Education; Alvarado I.S.D.; Anthony I.S.D.,


Aubrey I.S.D.; Bangs I.S.D.; et al., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. GV100528, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING







 Four school districts led by West Orange-Cove Consolidated Independent School
District (West Orange-Cove) appeal the dismissal of their action seeking a declaratory judgment that
the present school finance system is unconstitutional. (1) The interested parties include Felipe Alanis, (2)
Commissioner of Education, the Texas Education Agency, the Comptroller of Public Accounts, and
the Texas State Board of Education (collectively "the State"), and two groups of intervening school
districts, collectively the Alvarado intervenors and the Edgewood intervenors, who are generally
aligned with the State. We will affirm the judgment of the trial court.


BACKGROUND


 The current educational financing system was crafted in response to several federal
and state constitutional challenges to the long-standing school financing plan and to the initial
attempts to correct the identified constitutional infirmities. The first attacks were brought in federal
court; (3) ultimately, however, the challenges have been pursued through the state courts. In 1989, the
Texas Supreme Court held the school finance system unconstitutional because it violated the
following constitutional mandate: "A general diffusion of knowledge being essential to the
preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the
State to establish and make suitable provision for the support and maintenance of an efficient system
of public free schools." Edgewood Indep. Sch. Dist. v. Kirby, 777 S.W.2d 391, 393 (Tex. 1989)
(Edgewood I) (citing Tex. Const. art. VII, § 1). The basis of the court's holding were the gross
disparities among the schools throughout the state caused by the system's heavy reliance on local
property taxes to provide educational funds. Id. at 392-93. At the time of the Edgewood I decision,
local ad valorem taxes accounted for half of all available educational funds. Id. at 392. (4) As the
amount of revenue that can be raised by property taxes depends on the property wealth within each
district, there were staggering differences between the state's poorest and wealthiest districts. Id.


The wealthiest district has over $14,000,000 of property wealth per student, while the
poorest has approximately $20,000; this disparity reflects a 700 to 1 ratio. The
300,000 students in the lowest-wealth schools have less than 3% of the state's
property wealth to support their education while the 300,000 students in the highest-wealth schools have over 25% of the state's property wealth; thus the 300,000
students in the wealthiest districts have more than eight times the property value to
support their education as the 300,000 students in the poorest districts.



Id.

 Stating that the purpose of an "efficient system" as that term is used in the
constitution was to provide for a "general diffusion of knowledge," id. at 396, the court noted that
the then-present system "provides not for a diffusion that is general, but for one that is limited and
unbalanced," id. "The resultant inequalities," the court concluded, "are thus directly contrary to the
constitutional vision of efficiency." Id. In addition, the court found that the system was financially
inefficient because property-rich districts could generate substantial revenues at low tax rates, while
property-poor districts had to tax at high rates "merely to spend low." Id. at 393. The low rates of
property-rich districts also allowed valuable sources of the available tax base to be underutilized;
thus, additional revenues were consistently lost to the system. Id. The court noted that many
wealthy districts had become "tax havens" and that "if forced to tax at just average tax rates, these
districts would generate additional revenues of more than $200,000,000 annually for public
education." Id. The court held that the system violated the Constitution because it was "neither
financially efficient nor efficient in the sense of providing for a 'general diffusion of knowledge'
statewide," and exhorted the legislature to fulfill its obligation to provide an efficient system. See
id. at 397.

 The first legislative attempt to do so failed. In Edgewood II, the court struck down
the legislation, holding that the system remained in violation of section one of article VII. Edgewood
Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491, 498 (Tex. 1991) (Edgewood II). The court noted that
while the legislation had made some reforms to the system, it left intact the same funding scheme
"with the same deficiencies we reviewed in Edgewood I." Id. at 495. "Even if the approach of
Senate Bill 1 produces a more equitable utilization of state educational dollars, it does not remedy
the major causes of the wide opportunity gaps between rich and poor districts." Id. at 496. The court
noted that the proposed system


does not change the boundaries of any of the current 1052 school districts, the
wealthiest of which continues to draw funds from a tax base roughly 450 times
greater per weighted pupil than the poorest district. It does not change the basic
funding allocation, with approximately half of all education funds coming from local
property taxes rather than state revenue. And it makes no attempt to equalize access
to funds among all districts.



Id. The court reiterated that "[t]o be efficient, a funding system that is so dependent on local ad
valorem property taxes must draw revenue from all property at a substantially similar rate." Id. 
Emphasizing that "'[a] Band-Aid will not suffice; the system itself must be changed,'" id. at 498
(quoting Edgewood I, 777 S.W.2d at 397), the court held that the proposed scheme continued to
violate article VII, section one, id.

 The Legislature's next attempt to craft an "efficient" system ran into an independent
constitutional obstacle. In Edgewood III, the court reviewed a challenge that was based not on the
ground that the legislative design was inefficient, (5) but rather on the ground that it imposed a state
ad valorem tax in violation of article VIII, section 1-e. Carrollton-Farmers Branch Indep. Sch. Dist.
v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 502 (Tex. 1992) (Edgewood III) ("while the
Legislature has some latitude in the manner it chooses to discharge its duty to establish and maintain
an efficient public school system, it cannot go so far as to violate another constitutional provision
in attempting to comply with article VII, section 1."). In an attempt to ameliorate disparities while
retaining the historical dependence on local ad valorem taxes, the legislation created 188 county
education districts, or "CEDs," which were composed of school districts. Id. at 498. The CEDs had
no educational duties; rather, the CEDs were created to perform what had heretofore been the
districts' responsibility to administer local ad valorem taxes. Id. The CEDs had little discretion in
fulfilling this duty. The CEDs did not determine their own tax rates but instead "lev[ied],
collect[ed], and distribute[d] property taxes as directed by the Legislature." Id.

 The state constitution generally authorizes local ad valorem taxes, which are taxes
in proportion to the property's value, but when the State imposes an ad valorem tax, it violates article
VIII, section 1-e. See Tex. Const. art. VIII, §§ 1(b); 1-e. Various school districts and individual
citizens complained that the scheme constituted a state ad valorem tax because the CEDs' lack of discretion meant that the State effectively levied the tax. Edgewood III, 826 S.W.2d at 500. The
court agreed, emphasizing the indicia of state rather than local control over the ad valorem tax: 


Senate Bill 351 mandates the tax CEDs levy. No CED may decline to levy the tax. 
The tax rate for all CEDs is predetermined by Senate Bill 351. No CED can tax at
a higher rate or a lower rate under any circumstances. Indeed, the very purpose of the
CEDs is to levy a uniform tax statewide.



Id. In holding that this CED scheme constituted an unconstitutional ad valorem tax, the court set
forth the following test:


An ad valorem tax is a state tax when it is imposed directly by the State or when the
State so completely controls the levy, assessment and disbursement of revenue, either
directly or indirectly, that the authority employed is without meaningful discretion. 
How far the State can go toward encouraging a local taxing authority to levy an ad
valorem tax before the tax becomes a state tax is difficult to delineate. Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to
local authorities, to be approved by the voters if necessary, then the tax would not be
a state tax. The local authority could freely choose whether to levy the tax or not. 
To the other extreme, if the State mandates the levy of a tax at a set rate and
prescribes the distribution of the proceeds, the tax is a state tax, irrespective of
whether the State acts in it own behalf or through an intermediary. Between these
two extremes lies a spectrum of other possibilities.



Id. at 502-03.

 In response to the court's decision, the Legislature crafted a system that attempted to
comply with the constitutional directive of efficiency without impinging on the proscription against
state property taxes. (6) Finally, in Edgewood IV, the court held that the legislature had created a
funding system that passed constitutional muster. See Edgewood Indep. Sch. Dist. v. Meno, 917
S.W.2d 717, 750 (Tex. 1995) (Edgewood IV). All sides to the present dispute agree that the current
school finance system is essentially the same system upheld by the court in Edgewood IV. A brief
overview of the current provisions is helpful to an understanding of that decision.

 The financing mechanisms presently in place seek to ensure that every district has
adequate resources to provide an accredited education and "substantially equal access to funds to
provide an enriched program" and additional funds for facilities. Tex. Educ. Code Ann. § 42.002(b)
(West Supp. 2002). These goals are implemented by the "Foundation School Program" (the
Program), which establishes two "tiers" of funding for participating districts. Id. To be eligible to
participate in the Program, a district must set its maintenance and operations tax at a rate of at least
$0.86 per $100 valuation of property. (7) Id. §§ 42.252; 45.002; 45.003 (West 1996 & Supp. 2002). 
In return, the district receives for every student a "basic allotment" of $2,537. Id. §§ 42.101; 42.252
(West Supp. 2002). (8) This is known as "Tier one" of the Program. The schools, however, may tax
at a rate that exceeds $0.86 per $100 of property. Under the "Tier two" provisions, every district that
taxes at a rate of more than $0.86, up to the maximum rate of $1.50, receives an additional amount
for "enrichment" and for school facilities. Id. §§ 42.302; 45.003. For each penny that the tax is set
above $0.86, subject to the $1.50 cap, the district receives a guaranteed yield of $25.81 per each
student. Id. § 42.302. (9) 

 In Edgewood IV, the supreme court reviewed the current financing scheme in terms
of efficiency, as it had done in the first two Edgewood opinions, and in terms of "revenue," that is,
the "mechanisms through which [the system] provide[d] the funds to achieve efficiency," as it had
done in Edgewood III. 917 S.W.2d at 734. The court examined the current provisions in light of
the many issues raised by the efficiency and revenue challenges. A consistent theme of the court's
extensive analysis is that the relevant measuring stick for the system is the accredited education,
which the court equated with the constitutional term a "general diffusion of knowledge." See id. at
730 (noting that in the legislation authorizing the current school financing scheme, the "Legislature
equates the provision of a 'general diffusion of knowledge' with the provision of an accredited
education"); see also id. at 731 n.10 (stating that "accreditation standards . . . [are] the legislatively
defined level of efficiency that achieves a general diffusion of knowledge"). That is, whether the
court was discussing the efficiency of the system or the revenue mechanisms, the court's focus was
on the system's ability to provide a general diffusion of knowledge. 

 The court first concluded that the legislation was both educationally and financially
efficient because it ensured a general diffusion of knowledge, or accredited education, for all
students. Id. at 730-31. The court noted that in addition to making financial reforms, the legislation
which forms our present system also made significant educational reforms to the Education Code
by establishing an "accountability regime" that emphasizes academic achievement. Id. at 728-29. 
The court concluded that the accountability regime fulfilled the legislature's "constitutional
obligation to provide for a general diffusion of knowledge statewide." Id. at 730. The court also
found that the system was financially efficient because both tiers of funding allowed every school
district to provide a general diffusion of knowledge:


Based on the evidence at trial, the district court found that meeting accreditation
standards, which is the legislatively defined level of efficiency that achieves a general
diffusion of knowledge, requires about $3,500 per weighted student. After
adjustments, the Tier 1 allotment provides, on average, only $2,537 per weighted
student. Tier 2, however, enables a district to add up to $1,315.20 to this amount
($20.55 per cent of tax (10) times 64 cents [i.e., the difference between 1.50 and 0.86]). 
Thus, the district court found that every district can provide an accredited education
with funding provided by Tiers 1 and 2.



Id. at 731 n.10. (11) Thus, the educational and financial efficiency of the system, judged by its ability
to provide students with a general diffusion of knowledge, met the constitutional standard. 

 Similarly, the financing mechanisms through which this efficiency was achieved,
when measured in terms of the districts' ability to meet the state-required accredited education, did
not violate any constitutional provisions. Id. at 750. Of particular relevance to this appeal is the
court's conclusion that the tax provisions enabled all districts to provide an accredited education for
their students without violating the constitutional prohibition on state taxes. See id. at 738. The
court found that while the tax provisions did not allow the districts total discretion, the tax was
unlike the CED scheme struck down in Edgewood III. The current tax system, according to the
court, "lies somewhere in that 'spectrum of possibilities'" recognized in Edgewood III. Id. at 737
(citation omitted). "To receive any Foundation School Fund payments at all, a district must tax at
an effective rate of at least $0.86. [The legislation] does not, however, mandate a set rate or
prescribe the distribution of the proceeds. While a district may maximize its state aid by taxing at
$1.50, there is no requirement that it do so." Id. The court acknowledged that the legislature had
imposed a minimum and a maximum rate of tax for maintenance and operations, but stated that "the
imposition of such limits does not render [the system] unconstitutional. Id. Within these limits, the
statute afforded the districts a range of possible tax rates, thus leaving them meaningful discretion. 
Id. at 737-38. 

 The court stated that "[a]lthough financial incentives for property-poor districts and
the desire to maintain previous levels of revenue in the property-rich districts may encourage
districts to tax at the maximum allowable rate, the State in no way requires them to do so." Id. at
738. A state ad valorem tax issue would only arise, the court opined, if districts were forced to tax
at the maximum rate to fulfill the state-mandated requirement of providing an accredited education,
or, in the parlance of Edgewood IV, a general diffusion of knowledge. The court explained that the
tax cap might become both the "floor" and the "ceiling" if the cost of providing an accredited
education was the same as the maximum amount of revenue that could be raised, i.e., the $1.50 cap. 
Id. at 738. If forced to tax at the maximum allowable rate to meet a state obligation, a district would
be unable to exercise any meaningful discretion. Assuming this hypothesis, the tax might then
constitute an unconstitutional state tax:

[I]f the cost of providing for a general diffusion of knowledge continues to rise, as
it surely will, the minimum rate at which a district must tax will also rise. Eventually
some districts may be forced to tax at the maximum allowable rate just to provide a
general diffusion of knowledge. If a cap on tax rates were to become in effect a floor
as well as a ceiling, the conclusion that the Legislature had set a statewide ad valorem
tax would appear to be unavoidable because the districts would then have lost all
meaningful discretion in setting the tax rate.



Id.


The Instant Dispute

 West Orange-Cove believes that the court's warning has materialized due to rising
costs of educating students and that the $1.50 cap has now become the floor as well as the ceiling. 
West Orange-Cove asserted that it is forced to tax at or near the $1.50 cap "to educate its students,"
and that barring the declaratory relief it seeks, it will have to continue to take cost-saving measures
such as eliminating teaching positions, cutting programs, and increasing class sizes. (12) It asked the
trial court to declare that the tax approved in Edgewood IV has become an unconstitutional state ad
valorem tax.

 Alvarado intervened and filed special exceptions to West Orange-Cove's pleadings,
asserting that they failed to state a viable cause of action because the districts had pleaded only that
they were forced to tax at the cap to "educate their students." According to Alvarado, the only
relevant inquiry regarding the tax was a district's ability to meet the state-mandated accredited
education within the allowable range. Alvarado insisted that because the districts had failed to allege
that they were "required to adopt a $1.50 tax rate in order to provide the constitutionally-required
general diffusion of knowledge to their students," they had failed to allege an essential element of
their cause of action and urged the court to dismiss the claim. (13) 

 West Orange-Cove responded to the special exceptions. It also amended its original
petition, but did not add any allegation that it was forced to tax at or near the maximum rate to
provide an accredited education. A hearing was held at which Alvarado urged its special exception
on June 28, 2001. On July 24, 2001, the district court signed a modified final order dismissing the
case on special exceptions, finding that West Orange-Cove had failed to state a cause of action. (14) 


DISCUSSIONI. Failure to State a Claim

Standard of Review

 The Alvarado intervenors sought dismissal of the suit by way of special exceptions
on the ground that West Orange-Cove had failed to state a cognizable cause of action by omitting
a necessary element. A special exception is a proper method to determine whether a plaintiff has
pleaded a cause of action. Butler Weldments Corp. v. Liberty Mut. Ins. Co., 3 S.W.3d 654, 658 (Tex.
App.--Austin 1999, no pet.). When special exceptions are sustained, the pleader may either amend
the petition or refuse to amend and challenge the ruling on appeal. Id.; Detenbeck v. Koester, 886
S.W.2d 477, 479 (Tex. App.--Houston [1st Dist.] 1994, no writ). Although a trial court should
normally give a party the opportunity to amend the pleading, it need not do so if the pleading defect
is of a type that amendment cannot cure, such as a pleading that asserts an unrecognized cause of
action. Slentz v. American Airlines, Inc., 817 S.W.2d 366, 369 (Tex. App.--Austin 1991, writ
denied); Sepulveda v. Krishnan, 839 S.W.2d 132, 134 (Tex. App.--Corpus Christi 1992), aff'd, 916
S.W.2d 478 (Tex. 1995).

 Here, the trial court did not give West Orange-Cove an opportunity to replead; as it
stated in its final order, however, the court determined that the alleged defect was of a type that
amendment cannot cure. The court also stated that it understood from the hearing that West Orange-Cove wished to stand on its pleadings. Our review of the record indicates the correctness of the trial
court's determination that West Orange-Cove either could not, or did not seek to amend its
pleadings. West Orange-Cove responded to Alvarado's special exceptions by stating that it had
implicitly pleaded that it was forced to tax at or near the cap to provide a general diffusion of
knowledge and that its first amended petition made clear that the districts had alleged that they were
forced to tax at or near the cap "'to educate students in their districts,' i.e., to provide a general
diffusion of knowledge." West Orange-Cove continued, then, to couch its argument in terms of its
ability to educate students rather than its obligation to provide an accredited education. West
Orange-Cove's arguments at the hearing confirm the trial court's conclusion. West Orange-Cove's
position was that it could not, or soon would be unable to, furnish the kind of education it wanted
to provide at the cap. West Orange-Cove simply does not complain that it is unable to meet the state
obligation to provide a general diffusion of knowledge as that term has been defined to mean an
accredited education.

 When a trial court dismisses a case upon special exceptions for failure to state a cause
of action, we review that issue of law using a de novo standard of review. Butler Weldments, 3
S.W.3d at 658; Sanchez v. Huntsville Indep. Sch. Dist., 844 S.W.2d 286, 288 (Tex. App.--Houston
[1st Dist.] 1992, no writ). When reviewing a dismissal based upon special exceptions, we also must
accept as true all material factual allegations and all factual statements reasonably inferred from the
allegations set forth in the respondent's pleadings. See Sorokolit v. Rhodes, 889 S.W.2d 239, 240
(Tex. 1994). If a pleading does not state a cause of action, the trial court does not err in dismissing
the case. Butler Weldments, 3 S.W.3d at 658.

 As did the supreme court in its review of the school finance system, we begin with
the presumption that the statutory provisions under attack are constitutional; the burden of proof is
on the party challenging this presumption. As Edgewood III indicates, in determining whether a tax
is a state ad valorem tax, one compares the discretion afforded the local taxing authority with the
control exercised by the State. 826 S.W.2d at 500-03. "If the State mandates that a tax be levied,
sets the rate, and prescribes the distribution of the proceeds, the tax is a state tax . . . ." Id. at 500. 
The lack of discretion left to local taxing authorities was fatal to the taxing legislation at issue in that
case. Id. at 502-03. The court's test focuses on the amount of control exercised by the State over
the tax. If the control is complete, the taxing authority has no discretion in levying the tax; rather,
it taxes at the direction of and in the manner prescribed by the State. In contrast, if the taxing
authority has discretion, the State cannot be said to be controlling the levy. See Texas Mun. League
Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n & Subsequent Injury Fund, No. 00-1114, slip op. at 17-18, 2002 Tex. LEXIS 38, at *28 (Tex. Apr. 4, 2002) ("An ad valorem tax is a
prohibited tax under section 1-e when the State directly imposes it, or when a political subdivision
imposes it but the State indirectly controls the tax revenues' levy, assessment, and disbursement so
that the political subdivision lacks any meaningful discretion over these factors.").

 In determining the State's control over the maintenance and operations property tax,
the relevant inquiry is the relationship between the tax and the districts' obligations to provide an
accredited education. As the court found in Edgewood IV, the system may encourage districts to tax
at or near the maximum rate. Whether it does so is irrelevant for purposes of determining whether
the system imposes a state tax. But if the districts' abilities to fulfill a state mandate, here the
obligation to provide the minimum accredited education, forced the districts to tax at the maximum
rate, the system might approach an unacceptable level of state control over the levy. Therefore, the
allegation that a district is forced to tax at the highest allowable rate to provide the bare, accredited
education is a necessary element of a cause of action brought by a district challenging the cap. West
Orange-Cove instead pleaded that it was forced to tax at or near $1.50 to "educate its students." The
enriched education that West Orange-Cove locally desires to provide its students is not the measure
for determining if the State is imposing an educational mandate that requires the local district to levy
a state-imposed rate of tax. West Orange-Cove's pleadings simply fail to state a viable cause of
action.

 West Orange-Cove argues that by alleging to "educate its students" it means "to
provide a general diffusion of knowledge." But in Edgewood IV, the supreme court equated the 
term "general diffusion of knowledge" with a minimum accredited education. Ignoring this obstacle,
West Orange-Cove argued at the hearing before the trial court that the term is ambiguous and its
meaning should be litigated. The following exchange at the hearing evidences West Orange-Cove's
position:


The court: What is a general diffusion of knowledge?


Plaintiffs' counsel: We want to take discovery. We don't want to lose at this first
level. We want to take discovery. We want to hire experts. We want to look at the
State's numbers. The State has already said it's conclusive. It's already finished. 
You can't argue with it. They say that the general cost of diffusion in the state of
Texas is $4,167. And that is a $600 increase over the $3500 that was in Footnote 10
seven years ago. We have grave questions. That number is unacceptably low now. 
We want to ask: What goes into that? What has not been included?


* * *




 As the record makes clear, West Orange-Cove wants to use this opportunity, framed
as a tax challenge, to engage the judiciary in a debate over policy choices that are within the province
of the legislative branch. Both the Legislature and the supreme court have equated the term "general
diffusion of knowledge" with accreditation standards. The court, in addition, has insisted that the
judiciary has a limited role in the area of educational policy and should defer to the Legislature on
matters involving educational standards and funding:


This Court's role under our Constitution's separation of powers provision should be
one of restraint. We do not dictate to the Legislature how to discharge its duty. As
prominent as this Court's role has been in recent years on this important issue, it is
subsidiary to the constitutionally conferred role of the Legislature. The people of
Texas have themselves set the standard for their schools. Our responsibility is to
decide whether that standard has been satisfied, not to judge the wisdom of the policy
choices of the Legislature, or to impose a different policy of our own choosing.



Edgewood IV, 917 S.W.2d at 726. West Orange-Cove's claim would involve the courts in deciding
what is meant by the term "general diffusion of knowledge" without reference to the accreditation
standards set by the Legislature. That body, however, has conclusively equated the two concepts,
thereby foreclosing the judicial inquiry West Orange-Cove seeks to pursue. Moreover, as the
supreme court has recognized, the meaning of a "general diffusion of knowledge" and the
development of appropriate accreditation standards are policy choices best suited to the legislature. 
Id.

 West Orange-Cove's argument aside, this court is left with its pleading that it must
tax at the cap to "educate its students." This allegation does not refer to the districts' state-imposed
obligation to provide an accredited education; as such, the districts' pleadings fail to state a challenge
to the tax as a state tax. Accordingly, we hold that the trial court properly dismissed the claim for
failure to state a cause of action. 


II.  Ripeness

 In an abundance of caution, we will also address West Orange-Cove's second and
third issues regarding ripeness. Ripeness implicates subject-matter jurisdiction and emphasizes the
requirement that one must have a concrete injury to present a justiciable claim. Waco Indep. Sch.
Dist. v. Gibson, 22 S.W.3d 849, 851 (Tex. 2000); Patterson v. Planned Parenthood, 971 S.W.2d
439, 442 (Tex. 1998). Ripeness concerns when an action may be brought. Patterson, 971 S.W.2d
at 442. In order for a party to present a justiciable controversy, facts must be sufficiently developed
so that an injury has occurred or is likely to occur, rather than being contingent or remote. Id.; Texas
Dep't of Banking v. Mount Olivet Cemetary Ass'n, 27 S.W.3d 276, 282 (Tex. App.--Austin 2000,
pet. denied). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or
upon events that have not yet come to pass." Patterson, 971 S.W.2d at 443. A person need not have
incurred actual injury; a declaratory judgment action will lie if the facts present "ripening seeds of
a controversy." Mount Olivet, 27 S.W.3d at 282 (quoting Texas Dep't of Pub. Safety v. Moore, 985
S.W.2d 149, 153-54 (Tex. App.--Austin 2000, no pet.)). Such a situation arises "where the claims
of several parties are present and indicative of threatened litigation in the immediate future which
seems unavoidable, even though the differences between the parties as to their legal rights have not
reached the state of an actual controversy." Id.

 In its plea to the jurisdiction, the State urged the court to dismiss the suit on the
grounds of ripeness. The State argued that the supreme court in Edgewood IV was concerned with
the statewide financing system, hence, the tax might become unconstitutional only if the ceiling
became the floor "as to all districts." The declaratory action brought by West Orange-Cove, the State
urged, was premature because West Orange-Cove had pleaded only that it and three other districts
were unable to exercise discretion in setting their tax rates and had failed to plead facts that
demonstrated a system-wide lack of discretion. Additionally, the State provided evidence that the
majority of school districts in the state elect tax rates below the cap. Thus, the State reasoned, West
Orange-Cove's claim that the levy had become an unconstitutional state tax was not yet ripe. 

 The district court concluded that the number of districts that were taxing at the cap
was determinative of whether West Orange-Cove's claims were ripe and that a cause of action would
be ripe only if West Orange-Cove could demonstrate that at least half of all districts had tax rates
at $1.50. The court explained its view that "[f]or the legislative design to be an unconstitutional state
ad valorem tax, the design must require a significant number of districts to tax at the cap, something
approaching or exceeding half the districts." In its order, the district court stated that eighty-one
percent of districts taxed at rates under $1.50 and only nineteen percent taxed at the cap. The court,
however, also excluded those districts that taxed at $1.50 but provided the voluntary homestead
exemption (15) because by electing not to tax one hundred percent of available property, those districts
had demonstrated meaningful discretion in setting local tax rates. In addition, the court explained,
by exempting or sheltering twenty percent of property from taxation, the districts decreased the
amount of available revenue and, in effect, lowered the tax rate. Thus, districts taxing at $1.50 while
providing the homestead exemption were not truly taxing at the $1.50 cap. Once such districts were
excluded, the district court concluded that the number of districts "truly" taxing at the cap, that is,
taxing at the rate of $1.50 without granting the optional exemption, totaled only 12.19 percent of
districts in the state. The court then concluded that because fewer than fifty percent of all districts
taxed at the maximum rate, West Orange-Cove's pleadings failed to present a ripe claim under
Edgewood IV.

 West Orange-Cove advances several arguments in support of its position that its
request for a declaratory judgment is ripe. First, it argues that the trial court's ripeness analysis
focused on the presence of an actual injury without considering injuries "likely to occur" or "ripening
seeds of injury." See Patterson, 971 S.W.2d at 442; Mount Olivet, 27 S.W.3d at 282. In the
alternative, it contends that in considering whether West Orange-Cove had demonstrated an actual
injury, the trial court erred by determining that a claim would be ripe only if a plaintiff could show
that half of all districts were forced to tax at the cap and by excluding those districts that had granted
the optional homestead exemption. Last, West Orange-Cove argues that even if the court's analysis
were correct that ripeness for the purposes of West Orange-Cove's claim required a showing of a
systemic problem, its claim was ripe because the fact that twelve percent of districts, or one district
out of every eight, is taxing at the maximum rate indicates a sufficiently widespread problem with
the tax scheme.

 The parties frame their arguments on appeal in the context of the trial court's
reasoning that the number of districts, rather than the amount of state control, determines whether
this suit is ripe. For example, West Orange-Cove has divined significance in the language of the
isolated passage in Edgewood IV, emphasizing the word "some" in the following sentence:
"Eventually, some districts may be forced to tax at the maximum allowable rate just to provide a
general diffusion of knowledge." 917 S.W.2d at 738 (emphasis added). West Orange-Cove argues
that the word "some" indicates that the tax could become a state ad valorem tax as long as "some"
districts, even a minority, were taxing at the maximum rate. The State disagrees with West Orange-Cove's reasoning and argues that the court was concerned with the possibility of all districts being
forced to tax at the maximum rate to provide an accredited education. The State focuses on the next
sentence of the opinion, which reads: "If a cap on tax rates were to become in effect a floor as well
as a ceiling, the conclusion that the Legislature had set a statewide ad valorem tax would appear to
be unavoidable . . . . " Id. (emphasis added).

 As we explained above, the controlling factor in reviewing a challenge to an alleged
ad valorem tax is the State's involvement in the levy. Whether the effect of the tax is experienced
"statewide" or by a majority of districts in the state does not determine whether a tax is a state tax. 
Seen in this light, the positions taken by the district court in its order dismissing the case on ripeness,
and by the parties in their briefs, are based on a misunderstanding of the determinative factors of a
state ad valorem tax. The instant case is not unripe because fewer than half of all school districts are
taxing at the maximum rate; rather, the claim is unripe because the appellants have failed to
demonstrate that they are forced to set their rates of tax at the maximum allowable rate just to
provide an accredited education. That is, the districts have not pleaded that they have lost all
meaningful discretion in setting the rate of tax as it pertains to their ability to meet a state-imposed
obligation, which is the only relevant concern in this lawsuit.

 Therefore, because the districts have not asserted that the State, by requiring districts
to provide an accredited education, has effectively forced them to tax at the cap, their claim that the
cap is an unconstitutional state-imposed and state-controlled ad valorem tax is not ripe. Because of
our resolution of this issue we need not discuss West Orange-Cove's arguments complaining of the
analysis employed by the district court in its final order.


III.  Judicial Notice

 West Orange-Cove filed a motion requesting that we take judicial notice of certain 
information regarding the tax rates currently set by school districts. Specifically, it asks us to take
official notice of the rates of tax set by school districts for the 2001-02 year, as well as figures
relating to homestead elections made by the districts and student enrollment figures. West Orange-Cove states that the data relied on by the trial court in determining that the case was not ripe, and
figures cited by West Orange-Cove in its brief, were based on tax rates during the previous fiscal
year. The data offered by West Orange-Cove indicates that, if correct, the percentage of districts
taxing at the maximum rate has increased for the 2001-02 fiscal year. West Orange-Cove argues that
this Court should consider the new data in determining whether its claim is now ripe. Our resolution
of the ripeness question, however, makes the additional data of little relevance. That is, because we
hold that the accredited education requirement, a state-imposed mandate, not the number of districts,
determines whether West Orange-Cove's claim is ripe, any increase in the number of districts taxing
at the cap does not affect our analysis. Moreover, we hold that the information which West Orange-Cove requests we judicially note does not comply with the requirements of Rule of Evidence 201. 
See Tex. R. Evid. 201 (authorizing the taking of judicial notice under appropriate circumstances). 
Specifically, we hold that the information is neither "(1) generally known within the territorial
jurisdiction of the trial court [n]or (2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned." Tex. R. Evid. 201(b). Accordingly, we
overrule appellants' motion to take judicial notice.


CONCLUSION


 Having found that the trial court properly dismissed appellants' claim for failure to
state a claim and on the grounds of ripeness, we affirm the judgment.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: April 11, 2002

Publish
1.   We will refer to appellants collectively as West Orange-Cove.
2.   Jim Nelson was the Commissioner of Education when this appeal was submitted; he has
since resigned. Felipe Alanis was sworn in as Commissioner of Education on March 25, 2002 and
is automatically substituted as appellee. See Tex. R. App. P. 7.2(a).
3.   See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 55 (1973) (reversing lower
court decision holding that Texas school financing system violated the Equal Protection Clause of
the Fourteenth Amendment).
4.   Despite reforms to the system discussed infra, the state's reliance on local property taxes
to fund the educational system continues. The supreme court has remarked that once used merely
to "supplement" state funding, "local ad valorem taxes now are expected to provide most of the basic
needs of education." Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,
826 S.W.2d 489, 494 (Tex. 1992) (Edgewood III). The system's dependence on local revenue has
been a persistent problem that was recognized as early as seventy years ago: "The inequality of
educational opportunities in the main arises from natural conditions. . . . The type of school which
any community can have must depend upon the population of the community, the productivity of
its soil, and generally its taxable wealth." Mumme v. Marrs, 40 S.W.2d 31, 36 (Tex. 1931). The
problem remains despite attempts to lessen the dependence on local property taxes as a source of 
revenue. See generally Edgewood III, 826 S.W.2d at 494-498.
5.   The court specifically stated that the issue of the constitutional standard of efficiency was
not before it. Carrollton-Farmers Branch (Edgewood III), 826 S.W.2d at 494.
6.   See Act of May 28, 1993, 73d Leg., R.S., ch. 347, §§1.01-9.02, 1993 Tex. Gen. Laws 1479.
7.   In addition to the "maintenance and operations tax," a school district may also levy ad
valorem taxes to service bonds issued to pay for the construction of school buildings, the acquisition
or refinancing of property, the purchase of land for school buildings, and the purchase of new school
buses. Tex. Educ. Code Ann. § 45.001 (West Supp. 2002). The $1.50 cap does not apply to the rate
of taxes levied to service the bonds, which may be set at any rate sufficient to pay the principal and
interest on the bonds. Id. § 45.003. 
8.   This amount is subject to increase by way of legislative appropriations. Tex. Educ. Code
Ann. § 42.101 (West Supp. 2002).
9.   This amount is also subject to increase by way of legislative appropriations. Tex. Educ.
Code Ann. § 42.302 (West Supp. 2002).
10.   The current number is $25.81 per every cent between $0.86 and $1.50. Tex. Educ. Code
Ann. § 42.302 (West Supp. 2002).
11.   The court also found the system efficient because, relevant to concerns raised in Edgewood
I and Edgewood II, the system provided students with "substantially equal access to the [available]
funds"; significantly, the court stated that the legislation decreased the disparity in access to funds
from the 700 to 1 ratio that existed at the time of Edgewood I to a ratio of 28 to 1. Edgewood Indep.
Sch. Dist. v. Meno, 917 S.W.2d 717, 730-31 (Tex. 1995)
.
12.   West Orange-Cove's first amended petition, the live petition at the time of hearing,
requested the following relief: 


Accordingly, Plaintiffs request that the Court enter a judgment declaring that
the $1.50 statutory cap on M&O tax rates constitutes an unconstitutional
statewide ad valorem tax. This constitutional deficiency cannot be cured
simply by raising the statutory cap, because such a solution would only
aggravate the State's overreliance on local property taxes as a means of
financing the school system. Rather, Plaintiffs request that the State assume a
greater responsibility for financing the school system and end its overreliance
on the local property tax.
13.   Although the special exceptions filed by Alvarado were designated to be included in the
record for appeal, they were not included in our record. Nonetheless, West Orange-Cove's response
to Alvarado's special exceptions, in which it quotes from Alvarado's pleading, is in our record, as
is a transcript of the hearing on the plea to the jurisdiction and the special exceptions, at which
Alvarado appeared and urged its special exception. 
14.   The district court also granted the State's plea to the jurisdiction on ripeness grounds. This
issue will be discussed infra. 
15.   See Tex. Const. art. VIII, § 1-b ("Residence Homestead Exemption").